THE PEOPLE *ex rel.* Charles S. Deneen, State's Attorney,

*v.*

LESLIE A. GILMORE.

*Opinion filed February 21, 1905—Rehearing denied April 5, 1905.*

1. DISBARMENT—*conviction of attorney for embezzlement establishes bad moral character.* Conviction of an attorney of the crime of embezzling his client's money establishes the fact that he is of bad moral character, which is not altered by the fact that he was pardoned by the Governor before he had completed his term.

2. SAME—*concealment of fact of former conviction of crime is a fraud upon the courts.* Concealment by an applicant for admission to the bar of his former conviction of an infamous crime is, in any case, a fraud upon the courts.

3. SAME—*when concealment of the fact of former conviction is ground for disbarment.* Concealment by an applicant for admis-

sion to the bar of his conviction of an infamous crime in a foreign State is ground for disbarment, where the application was made but a few months after he had been released from prison, and where the evidence shows he has not reformed, but since his admission here has been convicted of conspiracy to obtain money by false pretenses, although the judgment was reversed on technicalities and a *nolle prosequi* subsequently entered. (*People* v. *Coleman*, 210 Ill. 79, distinguished.)

INFORMATION for disbarment.

CHARLES S. DENEEN, State's Attorney, (HARRY D. IRWIN, and JOHN L. FOGLE, of counsel,) for relator.

FRANCIS M. BURWASH, for respondent.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This is a petition filed originally in this court for the disbarment of the respondent, Leslie A. Gilmore. The respondent filed his answer and the cause was referred to a master to take and report the proofs, and the proofs have been heard and reported and the respective parties have filed their briefs.

The testimony discloses that in the year 1889 the respondent was a resident of Kansas City, Jackson county, Mo., and was a member of the bar of that State and engaged in the practice of his profession there. At the September term, 1890, of the criminal court of Jackson county an indictment was returned against him charging him with the crime for embezzling certain moneys belonging to one Mrs. Eva Abbott, which came into his hands in his capacity as the attorney of said Mrs. Abbott. At the December term, 1890, of the said criminal court of Jackson county, Mo., he was placed on trial before the court and a jury and was adjudged to be guilty of the offense charged in the indictment, and was convicted and sentenced to be imprisoned in the penitentiary of the State of Missouri for the period of five years. He prosecuted an appeal to the Supreme Court of the State of Missouri, and under the statutes of that State

was permitted to go at liberty during the pendency of the appeal. He absented himself from the State of Missouri and went to Colorado. On the 28th day of March, 1892, the judgment of his conviction and sentence to the penitentiary were affirmed by the Supreme Court. He was then absent from the State of Missouri and was in Colorado and did not return to Missouri, but in January, 1893, came to the city of Chicago. On the 4th day of June, 1894, he was arrested in the city of Chicago as a fugitive from justice and was taken by the officers to the State of Missouri and committed to the penitentiary of that State to serve the term of imprisonment to which he had been sentenced in the said criminal court of Jackson county. He remained a convict in the penitentiary of Missouri until August 21, 1896,—a period of about twenty-six months,—when he received a pardon from the then acting Governor of the State. He returned to Chicago, and within about two months presented his application for admission to the bar of this State. The circuit court of Cook county, acting on the motion and testimony of a member of the bar of that county, entered an order to the effect that the respondent was a person of good moral character, and a copy of that order was presented with his application. He did not make known to the circuit court, the Appellate Court (before whom he was examined) or to this court that he had been sentenced to and served as a convict in the penitentiary of the State of Missouri. His name was ordered to be placed on the roll of the members of the bar of this State, and a license as an attorney at law of this State was issued to him on the 6th day of November, 1896.

The crime of which the respondent was convicted and imprisoned in the penitentiary of the State of Missouri was an infamous offense, which involved not only moral turpitude, but also the lack of professional integrity. The conviction of that crime had the effect to degrade him and to establish that he was of bad moral character as a man and as a lawyer. The pardon granted him by the then acting

Governor of the State of Missouri did not efface the moral turpitude and want of professional honesty involved in the crime nor obliterate the stain upon his moral character. (*People ex rel.* v. *George,* 186 Ill. 122.) He obtained the certificate from the circuit court of Cook county that he was possessed of a good moral character by concealing from the court the fact that he had been adjudged guilty by the court of final resort of a sister State of an offense involving his guilt of personal dishonesty in his dealings as an attorney with a client, and also by concealing from that court that he had but so recently served as a convict in the penitentiary of the State of Missouri until relieved from such punishment by a pardon. His concealment of these facts was a fraud on the circuit court. He practiced a further fraud upon the Appellate Court and upon this court by presenting that certificate of good moral character so deceitfully and fraudulently obtained by him. Had this court been advised when the respondent asked an order admitting him to the bar that he had but only about two months before obtained his release from the penitentiary of the State of Missouri, where he had been imprisoned because adjudged to be guilty of the crime of embezzlement of funds which had been entrusted to him by a client, he would not have been admitted as a member of the bar of the State. He obtained his certificate of admission by deceitfully and falsely inducing this court to believe that he enjoyed and possessed a good moral character, knowing at the same time that he was purposely concealing a fact which would demonstrate that his assertion was untrue. To permit him to longer hold that certificate of admission would be to allow him to enjoy the fruits of his own fraud and deceit.

The respondent, in his answer, asserts that he was innocent of any actual wrongdoing in the transaction with his client in Missouri and that his conviction was not justified by the proofs and was wrongful. The respondent and the relator have presented to us the testimony of the witnesses

heard on the trial of the charge of embezzlement, as preserved in the record of that proceeding. Without conceding that any reason exists for declining to give full faith and credit to the adjudications of the courts of Missouri, we are unwilling to say that this testimony demonstrates that the respondent was innocent of the charge of which he was convicted. He was a member of the bar of Missouri and was employed by Mrs. Abbott as her attorney to collect an indebtedness due to her. He collected $500 from her debtor on the 22d day of October, 1889. He saw her within three days thereafter, and saw and consulted with her and advised her frequently during the nine months which intervened before an accusation of the crime was lodged against him and did not at any time inform her that he had collected any money for her, but, on the contrary, led her to believe that he had not received any money for her, until after she had caused a warrant to issue against him. He did not re-pay any of the money until after the affirmance by the Supreme Court of the judgment of conviction. While in the city of Chicago, a few months before he was seized as a fugitive from justice, he sent $240.75 to a friend in Kansas City, Mo., to be paid to Mrs. Abbott on condition that she would sign a letter to the Governor of the State which he had prepared and which he enclosed with the money. This letter contained some statements of alleged fact and a recommendation of the writer that the respondent should be pardoned. Mrs. Abbott signed the letter and received the money, but the pardon was not granted. About eight months thereafter the respondent was extradited from Illinois and placed in the penitentiary of Missouri.

It is true that in *People ex rel.* v. *Coleman,* 210 Ill. 79, we declined to accept the view urged upon us by the relator that the respondent ought to be disbarred on the charge made in the petition and admitted in the answer that the respondent had, previous to his application for admission to the bar of this State, been convicted in the courts of Indiana of a

felonious offense involving moral turpitude, had served a portion of a term of imprisonment in the penitentiary of that State, had been pardoned, and had obtained license to practice the profession of law in this State without having made known to the courts of this State that he had been so convicted of a felonious offense in the sister State. But in that case it appeared from the petition a period of thirteen years had elapsed between the time of the conviction and the time of the application for admission to the bar of this State, and the answer averred that for eight years of that time just preceding the application the respondent had been a resident of the State of Illinois; that he had during the eight years during which he had lived in Illinois before the license issued to him, and during the years since receiving the license, conducted himself as an honorable, upright and law-abiding citizen, and had thereby established and enjoyed, and was entitled to enjoy, the reputation of a man of good moral character. In this state of the pleadings the relator moved that judgment of disbarment be entered on the averments of the petition and answer thereto. This motion we declined to grant for the reason that it admitted the averments of the answer to be true, and if true, it appeared from such averments that the respondent had repented of the wrong he had done, had reformed his evil ways, and had by years of good conduct and honorable practices restored himself to public confidence as an honorable and worthy man before he sought admission to the bar of this State. The case of this respondent and that of Coleman are alike in the fact that neither of them advised the court that he had been convicted of a crime which affected his moral character, and we now distinctly say that such an omission cannot, in any instance, be regarded otherwise than as the reprehensible concealment of a fact which it is the duty of an applicant for admission to the bar to disclose. In the *Coleman case,* acting, as we did upon the averments of the petition and the answer, it appeared to us that Coleman had, before applying to this court

for license, by years of upright and honorable life recovered his standing as an honorable and moral man, and it also further appeared from the answer in his case that in the years that had elapsed after his admission to the bar in Illinois and before the petition for his disbarment had been filed, his life as a lawyer and as a citizen had been such as to demonstrate that his reformation had been complete and permanent and that he had maintained a good moral character. In these latter respects the case of this respondent is entirely unlike that of Coleman. He did not, after being released from further punishment in the penitentiary, devote any of the years of his life to the upbuilding of a moral character and to the obliteration of the bad moral reputation which had attached to him by reason of his conviction of a crime which involved a want of personal and professional integrity. On the contrary, he came almost directly from the doors of the penitentiary in Missouri to the presence of the courts in Illinois and deceitfully and fraudulently imposed himself upon our courts as a man of good moral character. And furthermore, the record in this cause discloses that he has, since receiving his license to practice law from this court, persisted in his evil and wicked ways. It appears from the testimony produced in this record that in 1899,—some three years after his admission to the bar of this State,—an indictment was returned against him by the grand jury of Carroll county, in this State, charging him and others with having entered into a criminal conspiracy to obtain the money of two citizens of that county by false pretenses and by means and use of the confidence game. On a trial before a jury in the circuit court of Carroll county the respondent and three others who were indicted as co-conspirators with him were adjudged to be guilty of the crime charged, and the respondent and two other of his co-conspirators were sentenced to be imprisoned in the penitentiary of this State at Joliet. This conviction was reviewed on a writ of error issued out of the Appellate Court for the Second District, and the judgment of convic-

tion was reversed for two reasons, as appears in the opinion
of the Appellate Court, (reported in 87 Ill. App. 128,) to
which respondent, in his answer, especially refers for the in-
formation of the court. The two grounds of reversal were,
(1) the refusal of the trial court to require the People to
apprise the respondent, by a bill of particulars, more defi-
nitely and particularly of the nature of the accusation against
him; and (2) that the State's attorney, in his address to the
jury, improperly referred to the failure of the respondent to
testify as a witness on the hearing of the cause. Respondent
alleges, in his answer, that after the reversal of the judgment
of conviction a *nolle prosequi* was entered in the cause by
the State's attorney.

We have, at the suggestion of the respondent, read the
opinion in that case, and have also read the testimony taken
by the respective parties on the reference made under this
petition. The nature of the charges of which the respondent
was convicted in the trial court in Carroll county was, that
the two prosecuting witnesses, who lived in Carroll county,
and three other persons who resided in Chicago, had en-
gaged in a scheme for tapping telegraph wires running to a
pool-room in Chicago and intercepting and delaying reports
of the racing of horses in order that they might win money
by betting on the winning horses, and that the three Chi-
cago conspirators conceived a plan of extorting money from
their Carroll county confederates in wire-tapping by induc-
ing them to believe that two of the Chicago confederates
had been arrested on a charge of tapping telegraph wires and
that the instruments and appliances for tapping the wires
had been seized by the officers, and that unless a large sum
of money should be provided by the Carroll county confed-
erates, to be used in corrupting the officers to surrender the
possession of these instruments and appliances for tapping
the wires, all of the confederates would be in danger of ex-
posure, arrest and conviction. It was contended by the
prosecution that the respondent, in his assumed capacity as

an attorney, was an actor in the conspiracy to obtain the
money of the Carroll county confederates in the wire-tapping
scheme, and was to share in the moneys that might thus be
extorted from the Carroll county men. One George C. Mas-
tin, a witness on the trial before the jury in Carroll county,
testified that he was an attorney at law in Chicago and was
consulted by a friend of the Carroll county men; that the
Carroll county men had drawn a draft for $2100 in response
to a telephone message from the respondent that that amount
would be required; that he (the witness) induced the holder
of the draft to deliver it to him and then called upon the re-
spondent to ascertain the facts as to the alleged necessity of
the payment of that sum of money by his clients; that the
respondent told him that the story that two of the Chicago
conspirators had been "placed in the central station was a
fake;" that one of the Carroll county men was badly scared
and would "give up many thousands of dollars rather than
be punished;" that the guilt of the parties was so evident
that they could not be defended; that if Mastin would advise
his clients to give up the $2100 he (Mastin) should have
one-third of it, and the balance would be divided between
himself (respondent) and another whom he did not name;
that the payment of $2100 would be much less punishment
than they would suffer if they were arrested and sent to the
penitentiary; that if they paid the $2100 they would be re-
lieved from all danger of prosecution and arrest. Mastin
substantially repeated these statements in his testimony taken
in this proceeding, and the respondent testified that the con-
versation as testified to by Mastin did not occur. The re-
spondent admitted that he went to Carroll county and had an
interview with the conspirators in the wire-tapping scheme
who lived there. His counsel, in his brief in this case, says
that the respondent in that interview explained to the Carroll
county men that "wire-tapping and conspiracy to tap wires
were crimes, and told them the penalties attached by statute
to each, and recited what Roach and Vaughn [two of the

214—37

Chicago conspirators] had already told him about a detective for the Western Union having taken the machinery, and suggested that if the parties in possession of the machinery and those prosecuting would cease their activity and give up the machinery on payment of their losses, the strongest evidence of guilt would be out of the possession of the prosecution;" that "while Gilmore has no recollection of the sum of $2000 being mentioned, the writer of this inclines to the opinion that Gilmore did express the opinion that the sum mentioned by Chisholm would be sufficient." Respondent testified on the hearing that after he returned to Chicago he telephoned the Carroll county men that $2100 would be required to "get the machinery," etc.

If the testimony of Mastin be true, the respondent was guilty as a party to the conspiracy to extort money from the Carroll county confederates and of prostituting his standing and position as a member of the bar to the furtherance of that criminal purpose. If the view urged by the respondent be true, it would appear he sought to obtain the money for the purpose of corrupting the public officers to surrender the evidence of the guilt of his clients, though it seems to be the better conclusion to be drawn from the evidence that the machinery and appliances for tapping the wires were never, in fact, in the hands of the police authorities. If the view of the respondent be accepted, there seems no escape from the conclusion that since his admission to the bar he has been guilty of professional misconduct evincing such lack of personal integrity and professional honor as to establish that he is unworthy to be longer allowed to hold a place in the ranks of an honorable profession.

The prayer of the petition will be granted, and judgment will be entered herein ordering that the name of the respondent be stricken from the roll of attorneys in this State, and also that the respondent pay the costs of this proceeding.

*Rule made absolute.*