STATE EX REL. ATTORNEY GENERAL v. IRBY.

4-3850

Opinion delivered April 8, 1935.

*Carl E. Bailey,* Attorney General, *F. G. Taylor, G. B. Oliver and Arthur Sneed,* for appellant.

*O. T. Ward, Wm. F. Kirsch* and *Maurice Cathey,* for appellee.

JOHNSON, C. J. This is a *quo warranto* proceeding instituted by the attorney general against W. O. Irby, acting as county judge of Clay County, Arkansas, in the Clay Circuit Court to oust him from said office. The complaint after alleging formal matters states:

"W. O. Irby is ineligible to hold the office of county and probate judge for the following reasons:

"That, on and prior to November 30, 1921, he was postmaster in the town of St. Francis, in Clay County, Arkansas, and as such postmaster had in his custody the money received from his said office, said money being the property of the United States of America, that the said W. O. Irby feloniously embezzled a large sum of money, to-wit, the sum of $2,266.80, the property of the United States; that said W. O. Irby was indicted for said embezzlement under § 225, of the Revised Criminal Code of the United States, in the district court of the United States for the Jonesboro Division of the Eastern District of Arkansas, and was arrested in the State of Mississippi, and brought back to Arkansas for trial; that said cause was transferred to the Little Rock Division of said district court for trial, and at said trial the said W. O. Irby was convicted of the crime with which he was charged in the indictment, and was sentenced to serve a year and a day in the Federal penitentiary at Atlanta, Georgia; that said W. O. Irby was taken to said penitentiary and served the required time according to his sentence and then liberated."

Appellee answered the complaint thus filed by alleging:

"For further answer and defense defendant admits that on and prior to November 30, 1921, he was the postmaster in the town of St. Francis, Arkansas, and that he was convicted in the district court of the United States for the Eastern District of Arkansas, of the crime of

embezzlement of moneys of the United States and that he was sentenced to the Federal penitentiary for said crime and served the term of his sentence; admits that he has not paid over to the United States of America the amount of money embezzled by him as set forth in the indictment, but states that prior to his election to said office to county and probate judge of Clay County, Arkansas, he was absolved from all liability to the United States for any moneys embezzled by him and ceased to owe it anything and had removed any disqualification or ineligibility that may have existed to his right to hold the office of county and probate judge, or any other office in the State of Arkansas, by reason of having had issued to him, and having received and accepted on the 19th day of February, 1931, a pardon from the Honorable Herbert Hoover, then President of the United States, pursuant to the powers in him vested as such President, which pardon in words and figures reads as follows:

"HERBERT HOOVER,

"PRESIDENT OF THE UNITED STATES

OF AMERICA

"To ALL TO WHOM THESE PRESENTS SHALL COME, GREETINGS:

"Whereas W. O. Irby pleaded guilty in the United States District Court for the Eastern District of Arkansas, to embezzlement of postal funds, in violation of § 225, United States Criminal Code, and was sentenced February 17, 1922, to imprisonment for one year and one day in the United States Penitentiary at Atlanta, Georgia; and

"Whereas the said W. O. Irby served his term, less allowances for good conduct, and was released January thirty-first, 1923, and

"Whereas it has been made to appear to me that the said W. O. Irby, since his release, has not been guilty of any further violation of law;

"Now, therefore, be it known, that I, Herbert Hoover, President of the United States of America, in consideration of the premises, divers other good and sufficient reasons me thereunto moving, do hereby

grant unto the said W. O. Irby a full and unconditional pardon, the purpose of restoring his civil rights.

"In testimony whereof I have hereunto signed my name and caused the seal of the Department of Justice to be affixed.

"Done in the District of Columbia this nineteenth day of February in the year of our Lord One Thousand Nine Hundred and Thirty-one and of the Independence of the United States the One Hundred and Fifty-fifth.

"HERBERT HOOVER.

"By the President;
"William D. Mitchell,
"Attorney General."

To the answer thus filed the Attorney General demurred, and, the demurrer being overruled by the trial court and the complaint subsequently dismissed, this appeal is prosecuted to test the sufficiency in law of said answer.

In *Irby* v. *Day,* 182 Ark. 595, 32 S. W. (2d) 157, we expressly held that Irby was disqualified to receive the democratic nomination to public office in this State because of his previous conviction for embezzlement of public funds, therefore any question as to his conviction resting in a foreign jurisdiction is laid at rest, and we shall not again consider it. The sole question here presented for consideration is, does a pardon by the Chief Executive restore to Irby all civil rights and political privileges enjoyed by him prior to his conviction?

We shall consider the question presented from three viewpoints, namely: First, is a public office a political privilege or a civil right under the Constitution and laws of this State: Secondly, if a political privilege, is it a part of the punishment inflicted upon one convicted of embezzlement of public funds? Third, if a political privilege and not a civil right, does executive pardon destroy the stigma of conviction and restore political privilege? As a preliminary to a consideration of these questions, it may be said that we are irrevocably committed to the rule that the Constitution of this State should be construed as a frame of laws and not as an ordinary statute (*Pulaski County* v. *Irvin,* 4 Ark. 473;

*State* v. *Scott,* 9 Ark. 270), and that where the language employed in the Constitution is plain and unambiguous the courts cannot and should not seek other aids of interpretation (*Clayton* v. *Berry,* 27 Ark. 227; *State* v. *Ashley,* 1 Ark. 513; *Ellison* v. *Oliver,* 147 Ark. 252, 227 S. W. 586), and that every word used should be expounded in its plain, obvious and common acceptation (*State* v. *Martin,* 60 Ark. 343, 30 S. W. 421; Ex parte *Reynolds,* 52 Ark. 330, 12 S. W. 570), and that inherently the chief executive has no power or authority to grant pardons except that expressly granted by constitutional mandate. *Baldwin* v. *Scoggins,* 15 Ark. 427, and *Hutton* v. *McClesty,* 132 Ark. 391, 200 S. W. 1032.

The pertinent provisions of the Constitution are as follows:

Section 9, of art. 5, provides: "No person hereafter convicted of embezzlement of public money, bribery, forgery or other infamous crime shall be eligible to the General Assembly or capable of holding any office of trust or profit in this State."

Section 18, of art. 6, is as follows: "In all criminal and penal cases, except in those of treason and impeachment, the Governor shall have power to grant reprieves, commutations of sentence and pardons after conviction; and to remit fines and forfeitures under such rules and regulations as shall be prescribed by law. In cases of treason he shall have power, by and with the advice and consent of the Senate, to grant reprieves and pardons; and he may, in the recess of the Senate, respite the sentence until the adjournment of the next regular session of the General Assembly. He shall communicate to the General Assembly at every regular session each case of reprieve, commutation or pardon, with his reasons therefor, stating the name and crime of the convict, the sentence, its date and the date of the commutation, pardon or reprieve."

Reverting to the first question, is the right to hold public office a political privilege or a civil right? it may be said that this question was laid to rest in the early case of *Taylor* v. *The Governor,* 1 Ark. 21, and the court

there so clearly announced our views on the subject that we quote from it at length, as follows:

"The office of sheriff is a public trust or agency, and it never becomes a right till the individual who claims it shows that he is constitutionally eligible. In the present case the applicant claiming a pretended right under the Constitution, clearly demonstrates (within the meaning of the instrument) that he is a defaulter, and hence he falls within its disqualification, and has no right to demand the office.

"The applicant has neither been dispossessed of his freehold nor in any manner deprived of his right, privileges or property, nor has he been denied the law of the land or judgment of his peers, or the freedom or equality of elections. All these privileges he possesses in as ample a manner and in as full a degree as any other citizen. The Constitution simply withholds from him public trust which depended upon his own volition or will, provided he complied with the condition annexed to the office. An *ex post facto* law declares that to be punishable in a manner that it was not punishable at the time it was committed, and relates exclusively to criminal proceedings. How then can it be said (when the Constitution annexes no penalty to the grant and inflicts no punishment) that it is void, being repugnant to the Constitution of the United States? This question is so plain in the opinion of the court that it requires no further solution. That the convention had full and ample powers to withhold office from public defaulters, and that they have done so, is equally certain. To deny the people, when acting in convention, this power, is to impeach the right of self-government, and to destroy the means by which its blessings and excellence can alone be perpetuated.

"What is a Constitution? The Constitution of an American State is the supreme, organized, and written will of the people acting in convention, and assigning to the different departments of the government their respective powers. It may limit and control the action of these departments, or it may confer upon them any extent of power not incompatible with the Federal compact. By an inspection and examination of all the Constitutions

of our own country, they will be found to be nothing more than so many restrictions and limitations upon the departments of the government and people. 'And the distinction,' says Chief Justice Marshall, 'between a limited and unlimited government is abolished if those limits do not confine the persons on whom they are imposed; and acts allowed and acts prohibited are of equal obligation.'

"If the Constitution can restrict the right of suffrage and the right of representation (and it has certainly done both) by positive enactments, and if it imposes conditions and limitations on all the departments of the government, legislative, executive and judicial, and confines them within their proper and appointed spheres, can it be imagined that it is incompetent to annex a condition to the office of collector and holder of the public revenue? The question again occurs, can the applicant claim the office of sheriff or demand the commission under the Constitution and by virtue and authority of his certificate of election, when by his own showing he had already demonstrated that his pretended right is an express violation of one of its most important and salutary provisions? The simple statement of the question carries with it the answer. The applicant having failed to establish any legal or vested right to the office or commission, he is not therefore entitled to the benefit of the writ, for when there is no injury the law affords no redress. It is clear he is a defaulter both to the Territorial and State government, and that he continued to be so at the time of the adoption of the Constitution and at the time of his election and at the time of the demand and refusal of his commission and at the time of filing his petition; and that he was in the exercise of the duties of sheriff, both before and after the adoption of the Constitution, and after its acceptance and ratification by Congress. He is then clearly within the meaning of the Constitution, and consequently ineligible to any office of profit or trust. So far as the rights and interest of the present applicant are concerned, the executive has done nothing that the law forbids; and whether his subsequent acts in relation

to the same matter are inconsistent with his constitutional obligations to the county, or in violation of private rights, this court will not take upon themselves to determine; for that question is not properly before them. The executive in common with every other officer, is bound by oath to support the Constitution, and wherever an effort is made to evade or violate it, it is not only his privilege but his duty to interpose and prevent it.

"The court conceive it to be no part of their duty to intimate an opinion in relation to the wisdom or folly of the clause disqualifying the applicant from office, or to say anything in regard to its effect or consequences. It is sufficient for them that they have found it in the Constitution, and of course they are bound to obey it."

In the more recent case of *State ex rel. Gray* v. *Hodges,* 107 Ark. 272, 154 S. W. 506, we expressly conceded that a notary public was a public office, but denied the privilege of holding such office to women because they were not then qualified as such to hold public office. The late Chief Justice HART, who wrote the opinion, said:

"This view is greatly strengthened when we consider that, under the common law which was in force in this State at the time of the adoption of our Constitution, a woman could not hold a public office. Opinion of the Justices, 73 N. H. 621, 62 Atl. 969, 5 L. R. A. (N. S.) 415, 6 A. & E. Ann. Cas. 283, and case note; *Attorney General* v. *Abbott,* 121 Mich. 540, 80 N. W. 372, 47 L. R. A. 92; Robinson's Case, 131 Mass. 376, 41 Am. Rep. 239. In the latter case the right of a woman to hold office was fully discussed, and the court, after citing and reviewing at great length the authorities bearing on the question, held that the political privilege of voting and holding public office was denied to women under the common law."

It will be noted that the gist of the opinion in the Gray case was that the right to hold public office in this State was and is a political privilege as distinguished from a civil right, and for this reason, and for this reason only, the privilege to hold public office was denied to women as the Constitution then existed. True, this disqualification of women was subsequently removed by an

amendment to the Constitution, but this in no wise impairs the effect or logic of the opinion here.

Without discussion of cases cited from other jurisdictions, we think we are irrevocably committed to the doctrine that the right to hold public office under the constitutional laws of this State is a political privilege and not a civil right. Next, is the denial of the political privilege of holding public office, as set forth in § 9 of art. 5, a part of the punishment inflicted upon one convicted of embezzlement of public funds? We can not conceive that it is. It is no more a part of the punishment inflicted for the commission of a crime than is § 5 of art. 6, which provides that no person shall be eligible to the office of Governor unless a citizen of the United States, thirty years of age and a resident of this State for seven years. Under the plain mandate of this section, all persons under thirty years of age are ineligible to be Governor; likewise all residents of this State of a less period than seven years are ineligible. It must be granted that neither the executive nor the legislative branch of this State Government has power or authority to remove and set at naught these constitutional disqualifications. *Rison v. Farr*, 24 Ark. 161. Likewise § 6 of art. 7 of the Constitution provides that a judge of the Supreme Court shall be at least thirty years of age, two years a resident of this State, and who has been a practicing lawyer eight years, etc. Manifestly, a person only twenty-nine years of age is excluded, or if such person does not possess the other designated qualifications he is likewise excluded, and neither the executive nor the legislative branches of the State Government have any power or authority to set at naught these constitutional qualifications. Similarly, § 4 of art. 5 of the Constitution provides that Senators and Representatives must be citizens of the United States, two years a resident of this State, and Senators shall be at least twenty-five years of age. Neither the executive, judicial nor legislative branch has any power or authority to set at naught these constitutional disqualifications. Many other constitutional disqualifications might be cited, but these will suffice to show the intent and purpose of the framers of the Constitution in ar-

ranging restrictions and safeguards upon its officeholders to protect the welfare of the State.

To hold that these safeguards and restrictions as they appear in our Constitution were promulgated as a punishment against the banished class can not be justified by interpretation. Such was neither the intent nor purpose of the framers of our Constitution. The clear and unmistakable intent and purposes was to safeguard the welfare of the State against such invasions as is now thrust upon it. Evidently it was the paramount thought that one who had been convicted for embezzling public funds should not again be trusted with their use, and we are unwilling to admit lack of wisdom in the framers of our Constitution in this regard.

The rule which we deem to be sound and based upon reason and logic is stated by the Supreme Court of North Dakota in *State, etc., v. Langer,* 256 N. W. 377, as follows:

"A State has an undoubted right to provide in its Constitution that persons may be * * * deprived of the right of suffrage by reason of having been convicted of crime. The manifest purpose of such restrictions upon this right is to preserve the purity of elections. The presumption is that one rendered infamous by conviction of felony, or other base offense indicative of moral turpitude, is unfit to exercise the privilege of suffrage. * * * The exclusion must for this reason be adjudged a mere disqualification, imposed for protection and not for punishment, the withholding of a privilege and not the denial of a personal right. 9 R. C. L. 1942. See also 20 C. J. 60. As the Supreme Court of North Carolina, considering a constitutional provision similar to the one involved in the case at bar, said: 'The disqualification for office and the loss of the right of suffrage imposed by art. 6 of the Constitution upon persons convicted of infamous offenses constitute no part of the judgment of the court, but are mere consequences of such judgment. *State* v. *Prince Jones,* 82 N. C. 685'." * * *

"The presumption is that one rendered infamous by conviction of a felony, or other base offense, indicative of great moral turpitude, is unfit to exercise the privilege of suffrage, or to hold office, upon terms of

equality with freemen who are clothed by the State with the toga of political citizenship. It is proper therefore that this class should be denied a right, the exercise of which might sometimes hazard the welfare of communities, if not the State itself, at least in close political contests. The exclusion must for this reason be adjudged a mere disqualification, imposed for protection and not for punishment—withholding an honorable privilege, and not denying a personal right or attribute or personal liberty. Pomeroy on Const. Lim., § 535; *Anderson* v. *Baker,* 23 Md. 531; *Blair* v. *Ridgley,* 41 Mo. 63, 97 Am. Dec. 248; Ex parte *Stratton,* 1 W. Va. 305; *Kring* v. *Missouri,* 107 U. S. 221, 2 S. Ct. 443, 27 L. ed. 506.''

We think it is obvious, and therefore have no hesitancy in so deciding, that § 9 of art. 5 or the disqualifications therein announced are no part of the punishment inflicted upon one convicted for embezzling public funds.

In view of what has been stated, does an executive pardon destroy the stigma of conviction and restore political privileges? We think this question in principle has been decided adversely to appellee's contention in the case of *State* v. *Carson,* 27 Ark. 469, wherein we held:

''The question now arises, does the Governor's pardon restore the office of probate and county judge to Carson, or does it only restore him to certain civil rights? In Ex parte *Garland,* (4 Wall. 381) the Supreme Court of the United States, in speaking of the effect of a pardon said: 'It does not restore to offices forfeited, or property or interests vested in others, in consequence of the conviction and judgment.' 4 Blackstone's Comm. 402; 7 Bacon's Abridgment Title, Pardon. In this case there was a trial, verdict and sentence. The appeal did not set aside the judgment of the circuit court, it merely suspended judgment, or rather, the execution of the judgment. Section 327, Criminal Code, page 329. * * *

''On the other hand, if it appears that a conviction took place before pardon, then it clearly follows, that the defendant cannot assume to exercise the functions and duties of the office of county and probate judge. In the case of the *Commonwealth* v. *Fugate,* (2 Leigh, Va., 724) a justice of the peace was convicted of a felony, and

afterwards pardoned by the Governor. On his return home, he resumed the exercise of the office of justice of the peace. A rule was made upon him to show cause why an information, in the nature of *quo warranto,* should not be filed against him, etc. To the rule, he pleaded his commission, qualification and pardon, as is done in this case. In disposing of the case BROCKENBROUGH, J., said: 'The court is decidedly of opinion that such judicial officer forfeits his office by conviction of a felony, and that no pardon can restore him'.''

Moreover, the rule which seems to be supported by the great weight of American authority, and is grounded upon reason and logic, is stated in 46 C. J. 1192, as follows:

''When a full and absolute pardon is granted, it exempts the individual upon whom it is bestowed from the punishment which the law inflicts for the crime which he has committed. The crime is forgiven and remitted, and the individual is relieved from all of its legal consequences. The effect of a full pardon is to make the offender a new man. While a pardon has generally been regarded as blotting out the existence of guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense, it does not so operate for all purposes, and, as the very essence of a pardon is forgiveness or remission of penalty, a pardon implies guilt; it does not obliterate the fact of commission of the crime and the conviction thereof; it does not wash out the moral stain: as has been tersely said, it involves forgiveness and not forgetfulness.'' *State* v. *Hazard,* 139 Wash. 497, 247 Pac. 957, 47 A. L. R. 538; 69 L. R. A. 71; 214 Ill. 569.

We think it self-evident that the issuance and acceptance of a pardon within its self irrevocably acknowledges a conviction of the crime pardoned, and has the effect only of restoring civil rights as distinguished from political privileges.

To give to executive pardon the effect contended for by appellee would nullify and destroy the safeguard retained in § 9 of art. 5, and when § 18 of art. 6, which gives to the Chief Executive of this State the power to grant pardons and § 2 of art. 2 of the Constitution of the United States which gives to the Chief Executive power

to grant pardons, are construed in the usual and ordinary manner, there is no contradiction. Section 18 of art. 6 and § 2 of art. 2 of the Constitution of the United States operate only after conviction ascertained, whereas § 9 of art. 5 of the Constitution of this State is a condition precedent to any one's right to hold public office in this State. When these provisions are thus construed, they are harmonious, and all doubts in reference thereto disappear.

Appellee contends that *Rison* v. *Farr, supra,* is in conflict with the views here expressed. The Carson case heretofore referred to and relied upon was decided subsequent to the Rison case therefore it is our duty to follow the more recent case, if conflict exists. Ex parte *Garland,* 4 Wallace 333, is likewise urged upon us, but this case was cited with approval in the Carson case, *supra,* and does not conflict therewith. Cases are likewise cited from other jurisdictions, for instance, Mississippi and Oklahoma which seem to hold contrary to our views, but, irrespective of this, it is our duty to follow our own cases in preference to cases from foreign jurisdictions, and, since we deem the vital questions here presented to have been decided in our own forum, we feel impelled to follow them.

It follows from what we have said that the judgment must be reversed and remanded, with directions to proceed in accordance with this opinion.

BUTLER, J., (dissenting). In the case of *Irby* v. *Day,* 182 Ark. 595, 32 S. W. (2d) 157, the court laid down the broad rule that no person convicted of embezzlement of public money shall be eligible to hold an office of representative in the General Assembly. This rule was based on § 9, article 5, of the Constitution, and did not take into consideration whether or not the conviction was in a court of foreign jurisdiction or for violation of its laws. An examination of the record and briefs in that case discloses the fact that the attention of the court was not called to the proposition that the ineligibility to hold office under § 9, article 5, *supra,* related to offenses against the laws of the State of Arkansas and convictions for such in its courts.

The essential distinction between the government of the United States and that of any State, as two independent political identities, is recognized, and has been frequently pointed out, in the decisions of the Supreme Court of the United States. *Fox* v. *Ohio,* 5 How. 432; *Moore* v. *People,* 14 How. 17; *Slaughter House Cases,* 16 Wall. 36; *Twining* v. *New Jersey,* 211 U. S. 78, 29 S. Ct. 14. The necessary effect of this distinction is that Federal courts are courts of entirely different sovereignty, foreign to, and wholly independent of, State courts. *Brown* v. *U. S.,* 233 Fed. 353, L. R. A. 1917A, 1133, and cases therein cited.

A judgment of a court of the United States, being therefore one of a foreign tribunal, the question arises: do the qualifications to hold office under §§ 8 and 9 of article 5 of our Constitution relate to offenses against a foreign jurisdiction and conviction in its courts? It has been held, upon great consideration, that a conviction and sentence for felony in one of the States and the disabilities arising from the same would not come within the inhibition of statutory and constitutional provisions of another State and the disqualifications therein denounced. Greenleaf on Evidence, 15th ed., § 376.

The rule stated in 46 C. J. 949, § 60, is as follows: "Constitutions or statutes frequently disqualify for office one who has been convicted of a felony or a crime generally. Whether or not a crime is within the meaning of such a provision is a question for the courts. Ordinarily conviction in the courts of the United States of an offense created by an act of Congress does not constitute a disqualification, but the Legislature, under authority of the Constitution, may declare that such a crime, either against the laws of the State, United States, or a sister State, shall operate as a disqualification."

The general rule for the construction of the Constitution with reference to disqualifications seems to be uniform and may be thus stated: where the Constitution disqualifies for office one who has been convicted of crime, such provision applies to crimes committed under the jurisdiction of the State providing the disqualifications, and not crimes against another government. The follow-

ing cases support this rule: *Wisconsin* v. *Insurance Co.*, 127 U. S. 265, 8 S. Ct. 1370, 32 L. Ed. 239; *Logan* v. *United States*, 144 U. S. 263, 12 S. Ct. 617, 36 L. Ed. 429; *Hildreth* v. *Heath*, 1 Ill. App. 82; *Garitee* v. *Bond*, 102 Md. 379, 62 A. 631, 111 Am. St. Rep. 385, 5 Ann. Cas. 915; *Commonwealth* v. *Green*, 17 Mass. 515; *Compare Commonwealth* v. *Hall*, 4 Allen (Mass.) 305; *State* v. *Landrum*, 127 Mo. App. 653, 106 S. W. 1111; *State ex rel. Mitchell* v. *McDonald*, 164 Miss. 405, 145 So. 508, 86 A. L. R. 290; *In re Ebbs*, 150 N. C. 44, 63 S. E. 190, 19 L. R. A. (N. S.) 892, 17 Ann. Cas. 592; *National Trust Co.* v. *Gleason*, 77 N. Y. 400, 33 Am. Rep. 632; *Sims* v. *Sims*, 75 N. Y. 466; *People* v. *Gutterson*, 244 N. Y. 243, 155 N. E. 113; *In re Kaufman*, 245 N. Y. 423, 157 N. E. 730; *Queenan* v. *Territory of Oklahoma*, 11 Okla. 261, 71 P. 218, 61 L. R. A. 324; *Weber* v. *State*, 18 Okla. Cr. 421, 195 P. 510; Ex parte *Biggs*, 52 Or. 433, 97 P. 713; *State ex rel.* v. *DuBose*, 88 Tenn. 753, 13 S. W. 1088; *Brown* v. *U. S.*, (C. C. A. Tenn.), 233 F. 353, L. R. A. 1917A, 1133; note *Goldstein* v. *State*, 75 Tex. Cr. R. 390, 171 S. W. 709; Ex parte *Quarrier*, 2 W. Va. 569.

The case of *State* v. *Langer*, 256 N. W. (N. D.) 377, is the only direct authority I have discovered stating a contrary doctrine. The case of *State* v. *Langer, supra*, cites a number of authorities in support of the conclusion reached by the majority, but, in an able dissenting opinion, these authorities are reviewed and it is clearly pointed out that they deal with different questions and do not sustain the position of the majority. From the foregoing it is perfectly apparent that the doctrine announced in *Irby* v. *Day, supra*, should be qualified to conform to the overwhelming weight of authority.

■ The appellee recognizes the effect of the decision in *Irby* v. *Day, supra*, as to his particular case, but contends that the pardon issued to him by the President of the United States absolves him from all the consequences of his conviction and places him in the attitude, in the eyes of the law, of never having committed the crime. To this contention the majority do not agree and base their conclusion upon §§ 8 and 9 of article 5 of the Constitution, ignoring all other constitutional provisions.

The Constitution of this State and the Constitution of the United States, alike, give to the chief executive the power to pardon, that of the President being unlimited except as to convictions under impeachment proceedings, and that of the Governor of a State except to impeachment proceedings and convictions for treason. One of the rules of construction and interpretation of any particular constitutional provision is that it should be considered in connection with other provisions in the Constitution so that effect may be given to all, and no one provision is superior to the others. Another rule is that the Constitution must be interpreted in the light and by the assistance of the common law. Cooley on Constitutional Limitation, 8th ed., vol. 1, p. 133.

Under the common law, the power to pardon was one of the prerogatives of the Crown, unlimited in extent, which, when exercised, removed not only the guilt of the one pardoned but likewise the legal infamy resulting therefrom and all other consequences arising out of the conviction. Bracton, Twiss' Translation, vol. 2, p. 371, and the case of *Cuddington* v. *Wilkins,* decided in 1615, and reported in Hob. 67, 81; also the case of *Searle* v. *Williams,* 2 Hob. 288, 294; 4 Blackstone, Comm. 402.

The power to pardon, as it existed under the common law of England, was conferred by the Constitution of this State upon the Governor and by that of the United States upon the President. "The power of pardon conferred by the Constitution on the President is plenary and unlimited, except in cases of impeachment. It is co-extensive with the power to punish, and extends to every offense known to the law; and it may be exercised at any time after the commission of the offense, either before legal proceedings are taken, or during their pendency, or after conviction and judgment. Its exercise, and the mode of its exercise, are placed, without condition or limitation, wholly in the discretion of the President, and it is not subject to legislative control. It includes the power to grant conditional as well as absolute pardons, and of commuting to a milder punishment that which has been adjudged against the offender. These propositions are fully supported by decisions of the Supreme Court

of the United States in the cases of *U. S.* v. *Wilson,* 7 Peters 150; Ex parte *Wells,* 18 How. 307; and Ex parte *Garland,* 4 Wall. 333. The power of pardon may be exercised even after the full punishment awarded for the offense has been suffered, if any of the legal consequences of the conviction remain." 8 Amer. Law Register, N. S., p. 516.

If effect is to be given to the constitutional provisions relating to the power of pardon, then, by necessary implication, §§ 8 and 9 of art. 5 of our Constitution and the disqualifications therein mentioned relate only to such convictions as have not been affected by the pardoning power. This proposition appears to be clearly established as a necessary result of decisions of our own court and of courts of the United States and also of courts of other states dealing with constitutional limitations on the right to hold office similar to our own.

A leading case is Ex parte *Garland, supra,* which quotes from the Constitution of the United States that the President "shall have power to grant reprieves and pardons for offenses against the United States except in cases of impeachment." Art. 2, § 2. It recognizes that the power is unlimited with the exception stated and extends to every offense known to the law. In discussing the effect of the exercise of the pardoning power, the court said: "A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity. There is only this limitation to its operation; it does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment."

In *Williams* v. *Brents,* 171 Ark. 367, 284 S. W. 56, this court quoted with approval the first sentence of the

quotation, *supra,* from Ex parte *Garland* and following this quotation, said: "Such is the effect of our own decisions."

The effect of this rule is that the pardon extended to Irby in the case at bar relieves him, first, of the debt due the United States Government. *Osborn* v. *U. S.,* 91 U. S. 474, was a case where the appellant, having violated the laws of the United States, was decreed to have forfeited —as part of the penalty for his offense—certain property which was sequestered by the officers of one of its courts and a part converted into money in the sum of over $20,-000. Appellant was pardoned and applied to the district court for the restoration of his property, which being denied, the case finally reached the Supreme Court of the United States where the relief prayed was granted, and, in passing, that court said: "The pardon of that offense necessarily carried with it the release of the penalty attached to its commission, so far as such release was in the power of the government, unless specially restrained by exceptions embraced in the instrument itself. It is of the very essence of a pardon that it releases the offender from the consequences of his offense."

To the same effect are the earlier cases of *U. S.* v. *McKee,* 4 Dill. 128; *U. S.* v. *Culbertson,* 8 Biss. 166; also *Armstrong's Foundry,* 6 Wall. 766; *Carlisle* v. *U. S.,* 16 Wall. 147; *U. S.* v. *Cullerton,* 25 Fed. Cases, No. 14,899, page 717.

Secondly, the effect of this rule is that the pardon relieves Irby of the consequences attendant upon his conviction and restores his status as a citizen as if he had never been convicted. This is the doctrine of the cases above cited. In *State of Washington* v. *Hazzard,* a case from the Supreme Court of the State of Washington, 139 Wash. 487, 247 Pac. 957, 47 A. L. R. 538, the court held in line with the case of Ex parte *Garland, supra,* and *State* v. *Carson,* 27 Ark. 469, that a pardon does not restore one to an office forfeited by conviction, but announced the general rule, as follows: "The doctrine has generally been accepted by the courts that a pardon, unless limited, restores one to the customary civil rights which ordinarily belong to a citizen of the State. These

are generally stated to be the right to hold office, to vote, to serve on a jury, to be a witness, and, in earlier times, the return of property forfeited by reason of, and punishment for, conviction of crime. But it does not restore offices forfeited nor property or interests vested in others in consequence of conviction."

In note 4 to the case of *State v. McIntire*, 59 Am. Dec. 579, a great many cases are noted which support the statement of law above quoted from *State* v. *Hazzard, supra.*

In an early case decided by the court of last resort of the State of New York—*People* v. *Pease*, 3 Johns. 333 —it was said: "It is admitted, on all sides, that the right of pardoning in cases of forgery resides in the Governor of this State to the same extent as in the King of Great Britain. Hence it is material only to ascertain whether the pardon of the Governor does away with all the consequent legal disabilities which have attached to him. The disabilities to which I refer form no part of the judgment against a convict, but are the legal marks of infamy which it fixes upon him. When, therefore, the judgment is pardoned, the legal infamy flowing from it is equally disposed of by the pardon. For the proposition appears to me untenable, that the judgment to which those disabilities are merely consequential, can be released, and yet the disabling effect thereof remain."

In the case of *Hildreth* v. *Heath*, 1 Ill. App. 82, one elected to the city council of Chicago was denied his seat because he had been convicted in the Federal District Court of the United States for an offense against the government involving moral turpitude. He had been pardoned for this offense by the President before his election to office, and the court held that the pardon removed and cured his disqualifications and ineligibility.

Quoting a headnote from *Rison* v. *Farr*, 24 Ark. 162-3: "The pardon of the President of the United States relieves the person pardoned from all the penalties attached to the specific act and restores him to his former rights and privileges."

In *Jones* v. *Board, etc.*, 56 Miss. 766, 31 Am. Rep. 385, the court quotes with approval from Ex parte *Garland,*

*supra,* and other decisions of the United States Supreme Court which are to the effect that a pardon absolves not only from the punishment for the crime for which one is convicted, but also from the attendant disabilities. The court found that the American and English authorities are univocal as to the effect of a full pardon and alike agree with the doctrine of the cases cited in that decision, and continuing, said:

"A pardon by the Governor is an act of sovereign grace, proceeding from the same source which makes conviction of crime a ground of exclusion from suffrage. The act of absolution is of as high derivation and character as the act of proscription. The pardon must be held to rehabilitate the person in all his rights as a citizen, and to deny to any officer of the State the right to impute to him the fact of his conviction. After the pardon, he is as if he was never convicted. It shall never be said of him that he was convicted. The pardon obliterates the fact of conviction, and makes it as if it never was.

"We have spoken of a pardon by the Governor, because our Constitution relates to that. The case before us involves a pardon by the President of the United States of a person convicted under the laws of the United States. The same effect must be given to such pardon as to a pardon by the Governor of one convicted under the law of the State. And if conviction under the laws of the United States will exclude from suffrage under our Constitution, a pardon by the President must absolve from guilt, and free from all the consequences of conviction, in the same manner and to as full extent as would a pardon granted by the Governor to one convicted under the law of the State."

Section 18 of article 5 of the Constitution of the State of Oklahoma provides: "No person shall serve as a member of the Legislature who is at the time of such service an officer of the United States, or of the State Government, or is receiving compensation as such; nor shall any person be eligible to election to the Legislature who has been adjudged guilty of a felony." In construing that section in connection with the constitu-

tional provision relating to pardons for those convicted of crime, the Supreme Court of Oklahoma, in the case of *State ex rel.* v. *Election Board, etc.*, 36 Pac. (2d) 20, held that a pardon removed the disqualification named in § 18 of art. 5, *supra*. That was a case where one Kiker had been indicted for embezzlement. He had pleaded guilty to the charge and was sentenced to a term of three years' imprisonment in the State penitentiary. Thereafter, he was granted a full and free pardon, and subsequently became a candidate for the office of State representative. The contention was that Kiker was ineligible to hold this office, and therefore to become a candidate for the same. Section 10 of art. 6 of the Oklahoma Constitution authorizes the Governor to grant pardons for all offenses, except in cases of impeachment, upon such conditions, etc., as he may deem proper, subject to such regulation as may be prescribed by law. No express grant is contained in this section to remove by the pardon the ineligibility mentioned in § 18, *supra*, but the effect of the court's holding is that this is implied if due effect is to be given to both provisions. In holding that the ineligibility was removed by the pardon, the court said: ''Provision is made by the Constitution to the effect that a convicted felon is ineligible for election as representative. Provision is also made by the Constitution for the removal of such ineligibility by the grant of a full pardon by the Chief Executive of the State. Such ineligibility of respondent having been removed, relator is without right.''

We have examined the cases cited by the majority and many others. We have found none which, upon a state of facts similar to those of the instant case, announces a contrary doctrine. In 46 C. J. 949, the following statement is made: ''It would seem to be the rule that the pardon of the executive will not remove disqualification resulting from conviction of crime.'' To support this statement, but one case is cited, that of *Commonwealth* v. *Fugate*, 2 Leigh's Reports (Va.), p. 724. This case is not authority, however, for the declaration of the text. The point there decided was whether or not one holding office, upon being convicted of a felony the effect of which was to forfeit his office, was restored

thereto by reason of having obtained a full and free pardon. The court said: The court is decidedly of the opinion, that such judicial officer forfeits his office by conviction and attainder of a felony; that no pardon can restore him to his former office.

There are decisions which use language of the following character: "A pardon implies guilt. It does not obliterate the fact of the commission of the crime and the conviction thereof. It does not wash out the moral stain." Such language is used in *State* v. *Hazzard* and *Commonwealth* v. *Fugate, supra.* These cases, however, in using this language, refer to the past and not to the future, and, as relating to the past, a pardon would be ineffectual to restore what had been lost by reason of conviction of crime. *Carson* v. *State, supra.*

The rules for construction stated by the majority are freely conceded; the vice of its opinion lies in overlooking another and cardinal rule of construction which I have named heretofore, and in giving prominence and preeminence to one provision without considering it in connection with another.

The conclusion that "political rights" are not civil rights, in my opinion, is unsound. True, they are not civil rights in the sense of the right to acquire, hold and dispose of property, and the like, but are civil rights in the broader and more comprehensive meaning of the term. As I understand "civil rights," they are not to be confounded with "natural rights," the birthright of all humanity, but are such as spring from the necessities of a civilized community and are designed to promote the welfare of the individual and the perpetuation of the State. Therefore, all rights which thus arise are, justly speaking, civil rights. These include both personal and property rights and the right to take part in the conduct of those matters relating to government—such as the right to elective franchise, to hold office and the like, which, as distinguished from property and personal rights, are political rights and included within and abridged, extended, protected and enforced by the more comprehensive term, "civil rights," comprehending and circumscribing all rights which the code, written or un-

written, of a civilized community gives to its citizens. *Byers* v. *Sun Savings Bank,* 41 Okla. 728, 139 Pac. 948, Ann. Cas. 1916D, 222; *State* v. *Hazzard, supra.* I submit it requires a strained and illogical interpretation of *Taylor* v. *Governor,* 1 Ark. 21, and *State ex rel. Gray* v. *Hodges,* 107 Ark. 272, 154 S. W. 506, to discover in those cases authority for the position of the majority, or which impairs the doctrine of the cases last cited above.

It seems, whatever "political rights" may be thought to be is immaterial to the determination of the principle involved, for, after all, it is not the nature of the right, but its existence that matters, and that one is deprived of it, whether as a part of the judgment of conviction or as a consequence flowing from it. For the majority to say that ineligibility to hold office, denounced by § 9 of art. 5 on one convicted of crime, is no part of the punishment inflicted is to state a proposition, the truth of which is difficult to perceive, and, save to the mind of a casuist, no argument however adroit and subtle can convince. As well to say that pain is but a figment of the imagination and the pangs attendant upon dissolution are no part of the article of death as to argue that the infamy resulting from the commission of crime and its disabling effect is no part of the penalty the offender must pay. This novel argument finds no support in our decisions, and is completely answered by the cases we have cited.

In support of the main proposition,—*i. e.,* that the pardon is ineffectual to remove the infamy of conviction or to remove the ban from holding office—*State* v. *Carson, supra,* and 46 C. J. 1192, are cited. These are authority for the rule—and that only—about which there is no dispute, but as to which the authorities are in entire accord, that a pardon does not undo the past or obliterate the fact of previous guilt, and therefore "does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment." This is the extent to which these decisions go, and they therefore do not support the majority opinion.

In so far as I have been able to discover, in this State from its beginning it has been the universal opinion of its chief executives, the bench and bar, that, even after the person convicted has "served his time" other disqualifications remained which a pardon could reach and remove; and so, from earliest times until the present, the Governor, after punishment adjudged had been fully endured, has granted frequent pardons "to restore citizenship" and persons pardoned (some being among the most able and respected of our citizens) have offered for responsible offices and have been elected and served without question. This is no unfounded opinion, for it is sustained by reason, principles of natural justice and by the voice of authority from remotest times.

I yield to none in profound respect for the judges who make the opinion of the majority, and it is with a measure of embarrassment that I have written in opposition to their able opinion; but, so strong are my convictions and so unfortunate the consequences, as I foresee them, that may arise, I am constrained to express my views, in which, I am authorized to say, Mr. Justice SMITH and Mr. Justice McHANEY, concur.