JOSEPHINE LINKER HART, Associate Justice
Appellant Mark Martin ("Secretary Martin"), in his official capacity as Secretary of State, and appellant-intervenor Randy Zook ("Zook"), individually and on behalf of legislative question committee, Arkansans for Jobs and Justice, appeal the September 6, 2018 order from the Pulaski County Circuit Court. The circuit court's order entered a declaratory judgment finding that Senate Joint Resolution 8, designated as "Issue No. 1" on the ballot for the November 6, 2018 general election, was not referred in accord with article 19, section 22 of the Arkansas Constitution, and issued a writ of mandamus ordering Secretary Martin to refrain from counting, canvassing, or certifying any votes cast for or against. We affirm.
I. Background
In 2017, the Arkansas General Assembly passed Senate Joint Resolution 8 ("SJR 8") as a proposed constitutional amendment pursuant to article 19, section 22 of the Arkansas Constitution, for Arkansas voters to vote upon during the November 6, 2018 general election. In accordance with Arkansas Code Annotated § 7-9-110 (Repl. 2018), Secretary Martin designated SJR 8 as "Issue No. 1" for purposes of the November 2018 ballot. SJR 8 mandated that its "Popular Name and Ballot Title" shall be:
(a) When presented on the general election ballot, the popular name for this proposed amendment shall be "An Amendment Concerning Civil Lawsuits and the Powers of the General Assembly and Supreme Court to Adopt Court Rules. "
(b) When presented on the general election ballot, the ballot title for this proposed amendment shall be "A proposed amendment to the Arkansas Constitution *373 providing that a contingency fee for an attorney in a civil lawsuit shall not exceed thirty-three and one-third percent (33 1/3 %) of the net recovery; defining "contingency fee" as an attorney's fee that is paid only if the claimant recovers money; providing that the General Assembly may amend the foregoing percentage by a two-thirds (2/3) vote of each house; limiting punitive damages awards for each claimant in lawsuits for personal injury, property damage, or wrongful death to the greater of (i) five hundred thousand dollars ($500,000), or (ii) three (3) times the amount of compensatory damages awarded; defining "punitive damages" as damages assessed to punish and deter wrongful conduct; providing that the General Assembly may not decrease the foregoing limitations on punitive damages but may increase the limitations by a two-thirds (2/3) vote of each house; providing that the limitations on punitive damages do not apply if the factfinder determines by clear and convincing evidence that the defendant intentionally pursued a course of conduct for the purpose of causing injury or damage to the claimant and that such intentional conduct harmed the claimant; limiting awards of non-economic damages in lawsuits for personal injury, property damage, or wrongful death to (i) five hundred thousand dollars ($500,000) for each claimant, or (ii) five hundred thousand dollars ($500,000) for all beneficiaries of an individual deceased person in the aggregate in a lawsuit for wrongful death; defining "non-economic damages" as damages that cannot be measured in money, including pain and suffering, mental and emotional distress, loss of life or companionship, or visible result of injury; providing that the General Assembly may not decrease the foregoing limitations on non-economic damages but may increase the limitations by a two-thirds (2/3) vote of each house; providing that the General Assembly shall adopt a procedure to adjust the dollar limitations on punitive damages and non-economic damages in future years to account for inflation or deflation; providing that the Supreme Court's power to prescribe rules of pleading, practice, and procedure for courts is subject to the provisions of this amendment; providing that the General Assembly, by a three-fifths vote of each house, may amend or repeal a rule prescribed by the Supreme Court and may adopt other rules of pleading, practice, or procedure on its own initiative; providing that rules of pleading, practice, and procedure in effect on January 1, 2019, shall continue in effect until amended, superseded, or repealed under the provisions of this amendment; providing that a rule of pleading, practice, or procedure enacted by the General Assembly shall supersede a conflicting rule of pleading, practice, or procedure prescribed by the Supreme Court; providing that certain other rules promulgated by the Supreme Court may be annulled or amended by a three-fifths (3/5) vote of each house of the General Assembly instead of a two-thirds (2/3) vote as presently stated in the Arkansas Constitution; and providing that this amendment becomes effective on January 1, 2019."
The actual text of SJR 8 divides Issue No. 1's parts[1] into four separate sections, and we will do the same for purposes of this opinion.
Section 1 proposes to place a 33 1/3 percent limit on attorney contingency-fee contracts and gives the General Assembly the power to pass additional laws for the *374 implementation of section 1, while also giving the General Assembly the power to pass additional laws to further define and alter the terms of section 1 and the limits on contingency-fee contracts.
Section 2 proposes to (1) place a $500,000 limit on a person's ability to recover noneconomic damages; (2) place a limit on punitive damages of the greater of $500,000 or three times a person's compensatory verdict; and (3) give the General Assembly the power to enact additional laws to implement section 2 and to change the stated limitations to damages awards.
Section 3 seeks to amend amendment 80 of the Arkansas Constitution to give the General Assembly the power to adopt, amend, and repeal rules of pleading, practice, and procedure for the entire Arkansas Judiciary.
Section 4 proposes the following changes to amendment 80: (1) amend section 9 of amendment 80 by lowering the vote threshold by which the General Assembly may annul or amend certain rules of the Arkansas Supreme Court related to section 5 of amendment 80 under which the supreme court determines the appellate jurisdiction of the court of appeals; (2) amend section 6(B) of amendment 80 under which the Supreme Court exercises superintending control over the way in which circuit judges may divide the circuit courts into subject-matter divisions; (3) amend section 7(B) of amendment 80 under which the supreme court establishes the jurisdictional amount and the subject matter of civil cases in district court (as well as criminal jurisdiction); (4) amend section 7(D) of amendment 80 under which the supreme court exercises superintending control over the way district judges may divide the district courts into subject-matter divisions; and (5) amend section 8 of amendment 80, under which the Supreme Court exercises superintending control over the way in which referees, masters, and magistrates may be appointed by the circuit and district courts and the duties they can perform.
On July 12, 2018, appellee Marion Humphrey filed a complaint in the Pulaski County Circuit Court seeking a declaration that Issue No. 1 is unconstitutional, along with a request for either a writ of mandamus or injunctive relief seeking to prevent Secretary Martin from counting, canvassing, or certifying any votes cast for or against Issue No. 1 at the November 6, 2018, general election. On July 25, 2018, appellant-intervenor Zook sought and was given permission to intervene in this matter. The circuit court then set a hearing for August 30, 2018, on Humphrey's claims for a declaratory judgment and a writ of mandamus.
Before the hearing, all parties briefed the issues. At the hearing, Humphrey argued that Issue No. 1 is unconstitutional because the sections of Issue No. 1 are not germane to each other or germane to a general purpose. Secretary Martin and Zook both argued that the sections are germane to each other and to a single purpose; however, each had different formulations of the "purpose" for Issue No. 1. Secretary Martin asserted that the general purpose of Issue No. 1 is "courts and the judiciary," while Zook maintained that the general purpose of Issue No. 1 is "judicial power." A hearing was held on August 30, 2018, with all parties presenting their arguments to the circuit court. After the hearing, on September 6, 2018, the circuit court issued its findings and its order. The circuit court's order provided as follows:
Issue No. 1, as proposed, clearly violates Art. 19, Sec. 22 of the Arkansas Constitution under any analysis.... Plaintiff has clearly demonstrated the four parts of Issue No. 1 are not reasonably germane to each other nor are *375 those four parts reasonably germane to the subject (whatever that subject may be) of the amendment.
Accordingly, the circuit court granted Humphrey's request for declaratory relief because Issue No. 1 violates article 19, section 22 of the Arkansas Constitution. The circuit court also issued a writ of mandamus ordering Secretary Martin to refrain from counting, canvassing, or certifying any votes cast for or against Issue No. 1. This appeal followed.
II. Standard of Review
This court reviews the circuit court's interpretation and construction of constitutional provisions de novo; however, in the absence of a showing that the circuit court erred, its interpretation will be accepted as correct on appeal. Forrester v. Martin , 2011 Ark. 277, 383 S.W.3d 375 ; State v. Oldner , 361 Ark. 316, 206 S.W.3d 818 (2005). When interpreting the constitution, this court's duty is to read the laws as they are written and interpret them in accordance with established principles of constitutional construction. Oldner , 361 Ark. 316, 206 S.W.3d 818. Thus, when the language of a constitutional provision is plain and unambiguous, it must be given its obvious and common meaning. Id. Neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision. Id.
However, unlike legislatively referred constitutional amendments that have been submitted to and adopted by the voters, there is no presumption of constitutionality afforded by this court during its review of pre-election-proposed amendments that have not been voted on and adopted or approved by the public. See Chaney v. Bryant , 259 Ark. 294, 298, 532 S.W.2d 741, 744 (1976) (explaining that it is only "after a proposed constitutional amendment has been ratified by the people, [that] every reasonable presumption, both of law and fact, will be indulged in favor of its validity").
This appeal also involves the circuit court's decision to grant Humphrey's request for a writ of mandamus. This court reviews the circuit court's decision to grant a writ of mandamus pursuant to the abuse-of-discretion standard. See City of North Little Rock v. Pfeifer , 2017 Ark. 113, 515 S.W.3d 593. An abuse of discretion occurs when the circuit court makes a decision that is arbitrary or capricious. Id.
III. Arguments and Analysis
This appeal concerns whether Issue No. 1 complies with article 19, section 22 of the Arkansas Constitution --the constitutional provision that allows the General Assembly to submit up to three proposed constitutional amendments for the public's consideration. Article 19, section 22 provides in its entirety:
Either branch of the General Assembly, at a regular session thereof, may propose amendments to this Constitution; and if the same be agreed to by a majority of all members elected to each house, such proposed amendments shall be entered on the journals with the yeas and nays, and published in at least one newspaper in each county, where a newspaper is published, for six months immediately preceding the next general election for Senators and Representatives, at which time the same shall be submitted to the electors of the State, for approval or rejection; and if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution. But no more than three amendments shall be proposed or submitted at the same time. They shall be so submitted as to *376 enable the electors to vote on each amendment separately.
Ark. Const. art. 19, § 22 (emphasis added). A plain reading of article 19, section 22 provides that the General Assembly can only submit up to "three" proposed amendments at a time and that the proposed amendments must be "submitted as to enable the electors to vote on each amendment separately." This court has held that "under article 19, section 22, there is no violation of the separate-issue requirement so long as all of the amendment parts are reasonably germane to each other and to the general subject of the amendment." Forrester v. Martin , 2011 Ark. 277, at 9, 383 S.W.3d 375, 381 (emphases added). We recently interpreted the word "germane" as it appears in another section of our constitution to mean "relevant; pertinent" or "having a close relationship." Martin v. Haas , 2018 Ark. 283, 556 S.W.3d 509.
We now turn to the case at bar. Humphrey argues that Issue No. 1 is unconstitutional because its contents are not "reasonably germane" to each other or to a "general purpose" pursuant to article 19, section 22 and our prior decisions interpreting that provision. Secretary Martin argues that Issue No. 1 does not violate article 19, section 22 because all four of its sections are reasonably germane to each other and to the general subject of the "judiciary and the courts." Zook argues that the four sections of Issue No. 1 are all reasonably germane to each other and to the general subject of "judicial power."
We conclude that Issue No. 1 does not comply with article 19, section 22 of the Arkansas Constitution.
First, the sections of Issue No. 1 are not all "reasonably germane" to each other. This is evident upon comparing the first section of Issue No. 1 to its other sections. Appellant Martin argues this issue as follows:
The connection between contingent attorneys' fees in Section 1 and damages in Section 2 is obvious-such attorneys' fees are contingent upon the amount of damages awarded, so those sections are reasonably germane to each other. And those sections both have a substantive interplay with Sections 3 and 4 because judicial procedure will govern the way in which the provisions of Sections 1 and 2 will be enforced in the courts.
Without opining upon the relationship between other sections, it is simply untenable to assert that section 1 is reasonably germane to sections 3 or 4. Section 1 limits the rights of private parties to contract for legal services. Sections 3 and 4 broaden and diversify the legislature's ability to exert influence over judicial rule-making authority. Section 1 does not operate to support, develop, clarify, or otherwise aid the function of sections 3 or 4 in any meaningful way, nor do sections 3 or 4 offer any such benefit to section 1. The first section of Issue No. 1 is simply not reasonably germane to the other sections.
Additionally, there is no "general subject" to which all of Issue No. 1's contents can be said to be reasonably germane. Again, this is evident upon comparing Issue No. 1's first section to its other sections. Secretary Martin and Zook argue that the first section, which limits contingency fees in civil actions to 33 1/3 percent, and the other sections are all reasonably germane to the general subject of "courts and the judiciary" or "judicial power." Obviously, an attorney representing a client under a contingency-fee agreement in a wrongful-death case (which section 1 addresses) will obtain a larger fee if the attorney obtains a larger recovery for the client's damages, including non-economic and punitive damages (which section *377 2 addresses). But how the actual percentage of any recovered amount is to be divided between attorney and client, which is the only subject to which section 1 applies, is entirely a matter of private agreement between client and attorney. The courts have nothing to do with such agreements.[2] The first section of Issue No. 1 is simply not reasonably germane to the general subject of "courts and the judiciary" or "judicial power."
Applying our rules of constitutional interpretation to the plain language of article 19, section 22 further confirms that Issue No. 1, as formulated in this specific case, does not pass constitutional muster. "One of the fundamental principles or rules in the construction of a constitution is that effect must be given to every part and that, unless there is some clear reason to the contrary, no portion of the fundamental law should be treated as superfluous, meaningless, or inoperative." Heathscott v. Raff , 334 Ark. 249, 256, 973 S.W.2d 799, 803 (1998) (Arkansas Supreme Court ruling that nonattorney's election to office of prosecuting attorney would violate article 7, section 24's requirement that any elected "prosecuting attorney ... shall be ... learned in the law"). Issue No. 1's current formulation is at odds with art. 19, § 22's plain language limiting the General Assembly to submitting only up to "three" constitutional amendments at the same time, and in such a manner that they may be voted "separately;" this language is a significant limitation that distinguishes the General Assembly's ability to submit a constitutional amendment from that enjoyed by the public, and it must bear some meaning. While SJR 8 divides Issue No. 1's substantive changes into "four" sections, Issue No. 1 would actually implement a considerably larger number of changes to our constitution. The actual text of SJR 8 itself, even by a generous reading, institutes at least seven individual numerated changes or additions to the constitution that would significantly alter the status quo.[3] If we consider the impact *378 SJR 8 would have on other constitutional provisions that the text of SJR 8 does not identify, such as article 2, section 13's guarantee that "[e]very person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character," the number of effective changes SJR 8 would impose is arguably even larger. In short, allowing the General Assembly to submit so many changes to our constitution under the guise of a single amendment, when the alleged links between those proposed changes are so attenuated and tangential (or even non-existent) as they are in this specific case, would render article 19, section 22's three-amendment limitation "superfluous, meaningless, or inoperative." Heathscott, supra.
For these reasons, any one of which would compel affirmance, see, e.g. , Alexander v. Chapman , 299 Ark. 126, 130, 771 S.W.2d 744, 746-47 (1989) ("We will affirm the trial court's ruling if it is correct for any reason."), we affirm the circuit court's ruling that the submission of SJR 8/Issue No. 1 violates article 19, section 22 of the Arkansas Constitution. Accordingly, there is no need to address any of the appellants' remaining arguments on this question, and we decline to do so.
Based on its ruling that Issue No. 1 violates article 19, section 22, the circuit court held that Humphrey was entitled to both a declaratory judgment and a writ of mandamus. Rule 57 of the Arkansas Rules of Civil Procedure allows for the issuance of a declaratory judgment. This declaration is allowed even when another adequate remedy may exist, and such declaration shall have the "force and effect of a final judgment or decree." See Ark. R. Civ. P. 57 ; Ark. Code Ann. § 16-111-101 (Repl. 2016). It is entirely appropriate for a court to declare one's right with regard to an action taken by elected officials. Jones v. Clark , 278 Ark. 119, 122, 644 S.W.2d 257, 259 (1983) (declaratory judgment is "a remedy peculiarly appropriate to controversies between citizens and public officials about the meaning of statutes"). One must only show a potential prejudicial impact to have standing. See Jegley v. Picado , 349 Ark. 600, 80 S.W.3d 332 (2002) ; Lawson v. City of Mammoth Springs , 287 Ark. 12, 696 S.W.2d 712 (1985).
Additionally, courts in these cases may grant any "further relief" whenever necessary and proper. See Ark. Code Ann. § 16-111-108. A party may seek mandamus wherein the court may command "an executive, judicial, or ministerial officer to perform an act or omit to do an act, the performance or omission of which is enjoined by law." Ark. Code Ann. § 16-115-101. The court shall hear the request and "shall hear and determine all questions of law and fact."
*379 Ark. Code Ann. § 16-115-108. A writ seeking mandamus "is traditionally regarded as a remedy to be used on all occasions where the law has established no specific remedy, and justice and good government require it." State v. Craighead Cty. Bd. of Election Comm'rs , 300 Ark. 405, 411, 779 S.W.2d 169, 172 (1989).
Furthermore, this court has routinely ordered the Arkansas Secretary of State to not count or certify any ballots cast for a proposed amendment that does not meet the requirements of the Arkansas Constitution or Arkansas law. See Christian Civil Action Comm. v. McCuen , 318 Ark. 241, 884 S.W.2d 605 (1994) ; see also Wilson v. Martin , 2016 Ark. 334, 500 S.W.3d 160 (enjoining the Arkansas Secretary of State from counting or certifying ballots for a proposed amendment that had an insufficient ballot title); Lange v. Martin , 2016 Ark. 337, 500 S.W.3d 154 (granting citizen petition and enjoining the Arkansas Secretary of State from counting or certifying any votes for a proposed constitutional amendment that did not meet the requirements of Arkansas law).
Here, Secretary Martin is the state official responsible for receiving an abstract of all votes cast for and against referred constitutional amendments, canvassing these returns, and certifying the results to the Governor of the State of Arkansas and the State Board of Election Commissioners. See Ark. Code Ann. § 7-9-119. Furthermore, Humphrey has a right to cast a ballot only on referred constitutional amendments that meet the standards set forth by the Arkansas Constitution. Accordingly, the circuit court did not err when it issued a declaratory judgment after finding that Humphrey had proved that Issue No. 1 is unconstitutional. Furthermore, the circuit court did not abuse its discretion when, in order to enforce its finding, it issued a writ of mandamus prohibiting Secretary Martin from counting, canvassing, or certifying the votes for or against Issue No. 1.
Affirmed.
Mandate to issue within five days.
Special Justice Stephen Tabor joins.
Wood, J., concurs.
Womack, J., dissents.
Kemp, C.J., not participating.
Although I agree that Senate Joint Resolution 8 fails the constitutional requirements of article 19, section 22 of the Arkansas Constitution, I cannot join the majority's analysis.
The majority continues to rely on the court-created doctrine of "germaneness" that was first implemented in Forrester v. Martin , 2011 Ark. 277, 383 S.W.3d 375. This reliance is misplaced, and worse yet, the application of germaneness fails. In utilizing this test, the majority finds that the various sections of SJR8 are not germane to one another because the first section, regarding contingency fees, has nothing to do with the remaining sections. The majority goes so far as to claim that "the courts have nothing to do with" limiting attorneys' contingency-fee agreements. This statement flies in the face of our own court rules, which prohibit attorneys from entering into contingency-fee agreements with clients in domestic relation matters and in criminal cases. Ark. R. Prof'l Conduct 1.5.
I also cannot agree with the majority's statement that "the alleged links between those proposed changes are so attenuated and tangential (or even non-existent)." As explained supra , there are links. We most certainly regulate, to an extent, whether attorneys can enter into certain contingency-fee *380 agreements. Moreover, this court manifested a link between its judicial power and liability limitations when it held in Johnson v. Rockwell Automation, Inc. , that it was within the court's authority to promulgate rules of procedure with respect to liability, not the legislature's law-making authority. See 2009 Ark. 241, 308 S.W.3d 135.[1] How then can the majority state any link between these provisions is "non-existent"?
Despite all of this, article 19, section 22 of the Arkansas Constitution clearly states that "no more than three amendments shall be proposed or submitted at the same time." "They shall be submitted as to enable the electors to vote on each amendment separately." Ark. Const. art. 19 § 22. SJR8's four sections amend (1) article 7, section 53(b); (2) article 5, section 32(d); (3) Amendment 80, section 3; and, (4) Amendment 80, section 9. These are at a minimum two, if not three separate amendments that must be submitted individually to the voters.
I am cognizant that many other legislatively initiated acts that would have failed this test in the past are now part of the constitution. They simply were not timely challenged. This court cannot look retrospectively at a proposed constitutional amendment it never had the opportunity to review.
The power to determine the public policy of the state belongs to the people in two ways: directly at the ballot box and indirectly through their elected representatives. Article 19, section 22 of the Arkansas Constitution joins the two by providing a mechanism for the elected representatives of the people to propose constitutional-level policy changes for the people themselves to adopt or reject. The role of the courts in this process is important but limited. Reviewing the proposal to ensure compliance with constitutional requirements is appropriate and necessary. Here, the majority steps beyond that limited role by disregarding the plain language of the constitution and applying a test that is not required to evaluate the legality of the proposed amendment. Because I disagree with the majority's analysis of Issue No. 1 and application of article 19, section 22, I must respectfully dissent.
The question in this case is straightforward: Does the proposed amendment in Issue No. 1 satisfy the requirement of article 19, section 22 of the Arkansas Constitution that legislatively referred amendments "shall be so submitted as to enable the electors to vote on each amendment separately" (henceforward the "separate-vote requirement")? The majority, relying on this court's questionable prior interpretation of that text, concludes that it does not. I believe the proposed amendment easily satisfies that constitutional requirement, either under a literal reading of the text or under the test set out by the majority.
The "reasonably germane" requirement, the operative concept discussed in detail by the majority, does not appear anywhere in our state's constitution, much less in article 19, section 22. In fact, the separate-vote requirement of the constitution lacks any discussion whatsoever of the content of legislatively referred amendments. On its face, all the separate-vote requirement says is that voters must be able to vote on each legislatively referred amendment-whatever that amendment might be-separately. If this court were to read the specified language as written, there would be no doubt that Issue No. 1 clears the bar. There is no contention from any party *381 that the General Assembly (or any other entity) has made or attempted to make the decision of voters on Issue No. 1 in any way tied to the fate of Issue No. 2, the other legislatively referred amendment set for this year's general election. The votes on the amendments are separate both in form and function.
The majority refers to our interpretation of "germane" in Martin v. Haas , 2018 Ark. 283, 556 S.W.3d 509, as a relevant interpretation of a similar term "as it appears in another section of our constitution." Majority Opinion, supra , at 376. It is important to note, however, that amendment 51, the part of the constitution we interpreted in Haas , actually includes the term "germane." It gives the General Assembly authority to amend the amendment "so long as such amendments are germane to this amendment, and consistent with its policy and purposes." Ark. Const. amend. 51 (emphasis added). Article 19, section 22 has no such requirement of germaneness.
Whence "reasonably germane" in this context, then? As the majority correctly cites, this court adopted the requirement in Forrester v. Martin , 2011 Ark. 277, at 9, 383 S.W.3d 375, 381, that legislatively referred amendments must contain only components that are "reasonably germane to each other and to the general subject of the amendment." This was not a piecemeal modification of our prior case law, we simply imported the interpretation that the Supreme Court of California applied to that state's facially similar legislatively referred amendment process. See Californians for an Open Primary v. McPherson , 38 Cal.4th 735, 43 Cal.Rptr.3d 315, 134 P.3d 299 (2006).
Even putting aside the basic atextuality of the Forrester court's decision to adopt this standard, two observations make reliance on Forrester problematic here. First, the California Supreme Court reached its conclusion by expressly reading the legislative referral language in concert with a separate provision of the California Constitution requiring initiatives to have a single subject.[2] Article 5, section 1 of the Arkansas Constitution, the parallel section outlining referenda and initiatives in this state, contains no such explicit requirement.[3] Second, the Forrester court goes on to describe the separate-vote requirement as the "separate-issue" requirement, a mistake quoted in the majority opinion. See Forrester , 2011 Ark. 277, at 9, 383 S.W.3d at 381 ; majority opinion, supra , at 376. While the Forrester court's wording can perhaps be attributed to a scrivener's error, describing any part of article 19, section 22 as a "separate-issue" requirement obscures that the text of article 19, section 22 requires only one thing to be separate: the votes.
Even accepting the Forrester standard as the correct one, however, the majority errs in holding that Issue No. 1 falls short. Despite any other faults with it, the most useful case to demonstrate this is Forrester itself. In assessing germaneness, both among amendment components and to a general subject, the Forrester court was, to put it mildly, not very demanding. The court summarized amendment 89, the enactment at issue in that case, as including *382 the following provisions: (1) giving to the General Assembly the sole power to set maximum lawful interest rates on bonds issued by, and loans made to, the government; (2) pegging interest and other financial rates for federally insured depository institutions in the state to those specified by federal statute; (3) setting a residual interest rate for other contracts not included in sections 1 and 2 ; and (4) authorizing governmental units to issue bonds for energy-efficiency projects. See Forrester , 2011 Ark. 277 at 7, 383 S.W.3d at 380. The court reasoned that the general subject of amendment 89 was "economic development and debt obligations," that all the provisions concerned this general subject, and that the seemingly out-of-place section 4 referenced section 1, and therefore all provisions were germane to each other. Id.
This same forgiving standard was evident in our earlier cases dealing with the separate-vote requirement (and before the importation of the "reasonably germane" test in Forrester ). In Brockelhurst v. State , 195 Ark. 67, 111 S.W.2d 527 (1937), we examined an amendment that (1) specified the avenues that prosecuting attorneys could use to charge an individual with a crime, and (2) empowered the General Assembly to set the salaries of prosecuting attorneys. We held that the connection between these two very different provisions to the general theme of "prosecuting attorneys" was more than sufficient to satisfy article 19, section 22. Id.
The majority has imposed a much stricter standard in this case than in either Forrester or Brockelhurst . Issue No. 1 is divided into four broad sections: (1) setting a limitation on contingency-fee contracts; (2) setting a limitation on noneconomic and punitive damages in some cases; (3) providing a role for the General Assembly in the adoption of court rules; and (4) changing the vote threshold for the General Assembly to annul or amend court-adopted rules. The majority takes the most umbrage at section 1, which it classifies as a limitation on the "rights of private parties to contract for legal services." Majority opinion, supra , at 377. For the "germane to each other" test, the majority opines that section 1's effect is unrelated to sections 3 and 4, which affect the legislature's rulemaking authority. For the "germane to a general purpose" test, the majority opines that section 1 is unrelated to the "courts and the judiciary" because the courts have no formal role in adjusting the division of an award between attorney and client. It seems likely, however, that limitations on contingency-fee contracts may change incentives in such a way that will alter the type and nature of cases that are brought before the courts. This is the sort of general connection that would have satisfied the undemanding standards on display in Forrester and Brockelhurst .
It is easy to imagine the majority in this case critiquing the amendment in Brockelhurst as, for example, a provision about prosecuting-attorney pay that was unartfully mashed together with a tangential provision about grand juries on which pay has no bearing. Or perhaps the Forrester amendment would become a scatterbrained list of amendments limiting freedom-of-contract rights on interest rates logrolled with an energy-efficiency initiative. If the test is how related the sections sound when presented as uncharitably as possible, it is difficult to imagine that any of these amendments would pass the test.
Finally, amendment 80 of the Arkansas Constitution is instructive in this instance. It covers a wide range of issues, and like Issue No. 1, those issues are all related in some way to the court and judiciary in Arkansas. There are 22 sections in amendment 80. Section 1 vests the judicial power *383 exclusively in "a Supreme Court and other courts established by this Constitution." Section 2 provides for the makeup of the supreme court and describes our jurisdiction. Sections 3 and 4 give the supreme court authority over rules of pleading, practice, and procedure and superintending control over all other courts of the state. Sections 5 through 8 provide for a court of appeals, circuit courts, district courts, referees, masters, and magistrates. Section 9 deals with legislative powers and allows the rules promulgated by the supreme court to be "annulled or amended, in whole or in part, by a two-thirds (2/3) vote of the membership of each house of the General Assembly." Section 10 also addresses legislative powers, giving the General Assembly the power to establish jurisdiction and venue and to determine the makeup of judicial circuits and districts and the number of judges in each. Section 11 provides for a right of appeal. Sections 12 and 13 address temporary disqualification of judges and appointments of special judges. Sections 14 and 15 place limitations on activities of judges and justices. Sections 16 through 18 provide for the qualifications and elections of judges and justices. Section 20 provides for the election of prosecuting attorneys and establishes their qualifications for office and length of terms. Section 22 repeals other parts of the constitution.
Amendment 80, like Issue No. 1, was a legislatively referred amendment under the power provided in article 19, section 22. It was approved by the General Assembly in 1999 and adopted by the people in 2000. Its subjects range from judicial power to legislative power, from elections and qualifications of judges and justices to elections and qualifications of prosecuting attorneys, from adoption and amending of rules to prohibition of the practice of law and candidacy for non-judicial offices. Amendment 80 is the modern foundation of the Arkansas Judiciary, but it never would have survived a challenge in front of this court if we were to use the standard as applied here by the majority.
In summary, the majority has used an extraconstitutional, judicially created test, imported from California, to stop the people of Arkansas from exercising their public policy making power to either accept or reject a change proposed by their elected senators and representatives. Issue No. 1 satisfies the requirements set out in article 19, section 22 of the Arkansas Constitution, whether that provision is understood by its literal terms or by this court's prior interpretations. There is no doubt that, if passed, all sections of the proposed amendment would affect the courts and judiciary of Arkansas. If the impact of Issue No. 1 on the courts and on civil litigation would be too expansive, our constitution leaves that decision to the voters of Arkansas to make at the ballot box, not to a majority of this court of seven.
I respectfully dissent.

This opinion will refer to SJR 8 and its sections as "Issue No. 1."

In an effort to identify and flesh out a link between such agreements and the courts, Appellants point to Rule 1.5 of the Arkansas Rules of Professional Conduct, which provides that "[a] lawyer's fee shall be reasonable ..." based on numerous considerations that will vary from case to case. Appellants' argument is unavailing. Setting an arbitrary cap on a citizen's ability to contract is not a matter contemplated by the Rules of Professional Conduct. The Arkansas Rules of Professional Conduct "provide a framework for the ethical practice of law" and "are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." Ark. R. Prof'l Cond. , Scope . The Rules of Professional Conduct apply to attorneys, not to citizens. Furthermore, this set of ethical rules applies to all cases, not just those involving contingency fees. Regardless of Issue 1's fate, Rule 1.5 will still be in place governing all attorneys who charge a fee, not just contingency fees, and then only requiring that such fees be "reasonable," based upon the specific circumstances of a given case. Put simply, the mere fact that Rule 1.5 exists does not render a cap on the acceptable percentage in all civil contingency fee cases "reasonably germane" to either "courts and the judiciary" or "judicial power."

Specifically: (1) creating a 33 1/3 percent cap on attorney contingency fee agreements at what would be art. 7, § 53(b), when no such cap presently exists; (2) creating a cap on punitive damages at what would be art. 5, § 32(c), when no such cap presently exists; (3) creating a cap on non-economic damages at what would be art. 5, § 32(d), when no such cap presently exists; (4) amending and adding to Amendment 80, § 3 to eliminate the Arkansas Supreme Court's existing ability to implement rules of pleading, practice, or procedure, except at the approval of the General Assembly; (5) conferring upon the General Assembly the new power to amend or repeal an existing rule of pleading, practice, or procedure implemented by the Arkansas Supreme Court at what would be Amendment 80, § 3(b)(1)(A); (6) conferring upon the General Assembly the new power to adopt a new rule of pleading, practice, or procedure at its own initiative at what would be Amendment 80, § 3(b)(1)(B); and (7) lowering the existing threshold set by Amendment 80, § 9 for the General Assembly to amend or annul an existing rule implemented by the Arkansas Supreme Court pursuant to its superintending control over the Arkansas Court of Appeals, circuit courts, and district courts, as well as any appointed referees, masters, or magistrates from a two-thirds (2/3) vote of the membership of each house of the General Assembly to a three-fifths (3/5) vote of the membership of each house of the General Assembly. See S. J. Res. 8, 91st Gen. Assemb., Reg. Sess. § 1-4 (Ark. 2017). The first of these changes would be applicable in all civil actions. The next two would only be applicable in civil cases of personal injury, wrongful death, or property damage. The remaining changes, including the provisions empowering the General Assembly with judicial rulemaking authority, would be applicable in all forms of state litigation. Id.

That is not to say that I agree with this holding.

"An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." Cal. Const. art. 2, § 8 (d).

As is helpfully-but perhaps unintentionally-demonstrated by the dissent in Forrester and the appellee's briefing in this case, the framers of the Arkansas Constitution knew how to specify a single-subject requirement when they wanted to. Just such a requirement appears in the legislative article and requires that most appropriations be in the form of "separate bills, each embracing but one subject." Ark. Const. art. 5, § 30.