Cite as 2025 Ark. 207

# SUPREME COURT OF ARKANSAS
No. CV-24-704

| | |
|---|---|
| STATE OF ARKANSAS; ARKANSAS DEPARTMENT OF FINANCE AND ADMINISTRATION; AND ARKANSAS DEPARTMENT OF FINANCE AND ADMINISTRATION, ALCOHOLIC BEVERAGE CONTROL DIVISION<br><br>APPELLANTS<br><br>V.<br><br>GOOD DAY FARM ARKANSAS, LLC; AND CAPITAL CITY MEDICINALS, LLC<br><br>APPELLEES | **Opinion Delivered:** December 11, 2025<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-22-931]<br><br>HONORABLE MORGAN E. WELCH, JUDGE<br><br>REVERSED AND DISMISSED. |

**CODY HILAND, Associate Justice**

This appeal concerns the General Assembly's authority to amend voter-initiated laws and the constitutional limits on the germaneness of such amendments. On appeal, the State of Arkansas, the Arkansas Department of Finance and Administration, and its Alcoholic Beverage Control Division (collectively, the "State"), ask us to decide two questions: first, whether authority to amend exists under article 5, section 1 of the Arkansas Constitution; and second, whether the word "section" in section 23(a) of amendment 98 should be read as "amendment" for the purpose of applying its germaneness requirement? The Pulaski County Circuit Court held that the General Assembly has no such authority under article 5, section 1, as *Arkansas Game & Fish Commission v. Edgmon*, 218 Ark. 207, 235 S.W.2d 554

(1951), controls, and that the use of the term "section," rather than "amendment," limits the application of section 23(a)'s germaneness requirement. We disagree and therefore reverse and dismiss.

## I. *Background*

In November 2016, the people of Arkansas voted to approve the Arkansas Medical Marijuana Amendment of 2016, which became amendment 98 to the Arkansas Constitution. Amendment 98 authorizes the possession and prescribed use of marijuana for medicinal purposes and establishes a framework for the cultivation, dispensing, and prescription of medical marijuana within Arkansas.

Section 23 of amendment 98 provides that the General Assembly of Arkansas "may amend the sections of this amendment" "in the same manner as required for amendment of laws initiated by the people," a reference to article 5, section 1 of the Arkansas Constitution. Under article 5, section 1, the General Assembly may "amend or repeal" a measure approved by the people only "upon a yea and nay vote on roll call of two-thirds of all members elected to each house." At the same time, amendment 98 imposes limits on that power, including section 23(a)'s requirement that any legislative amendment be "germane to this section and consistent with its policy and purposes." Section 23(b) further prohibits the General Assembly from amending specific portions of amendment 98, including section 23 itself.

Since 2016, the General Assembly has enacted twenty-eight amendments to amendment 98 over the course of four legislative sessions, each approved by a two-thirds

vote of both houses.[1]   These legislative amendments were not referred to the people of Arkansas for a vote.

Good Day Farm Arkansas, LLC ("GDFA"), a licensed medical marijuana cultivator, and Capital City Medicinals, LLC ("CCM"), a licensed medical marijuana dispensary, are subject to amendment 98 and its subsequent amendments.  GDFA and CCM filed a complaint against the State in the Pulaski County Circuit Court seeking declaratory judgment.  In Count I, they alleged that the General Assembly's twenty-eight amendments to amendment 98 were unconstitutional as they were not submitted to the people for approval under article 19, section 22 of the Arkansas Constitution.  GDFA and CCM argue this process is required by this court's 74-year-old precedent arising out of *Arkansas Game & Fish Commission v. Edgmon*, 218 Ark. 207, 235 S.W.2d 554 (1951).  In Count II, they

---

[1]Act 4 of 2017 (amending Ark. Const. amend. 98, §§ 4, 8 & 9); Act 5 of 2017 (amending Ark. Const. amend. 98, §§ 2, 5 & 10); Act 438 of 2017 (amending Ark. Const. amend. 98, § 2); Act 479 of 2017 (amending Ark. Const. amend. 98, §§ 2 & 6); Act 544 of 2017 (amending Ark. Const. amend. 98, § 2); Act 545 of 2017 (amending Ark. Const. amend. 98, §§ 4, 8 & 9); Act 587 of 2017 (amending Ark. Const. amend. 98, § 8); Act 593 of 2017 (amending Ark. Const. amend. 98, §§ 2 & 3); Act 594 of 2017 (amending Ark. Const. amend. 98, §§ 8 & 9); Act 638 of 2017 (amending Ark. Const. amend. 98, § 19); Act 639 of 2017 (amending Ark. Const. amend. 98, §§ 4, 8 & 9); Act 640 of 2017 (amending Ark. Const. amend. 98, § 8); Act 641 of 2017 (amending Ark. Const. amend. 98, § 8); Act 642 of 2017 (amending Ark. Const. amend. 98, §§ 8 & 11–13 and adding §§ 24 & 25); Act 670 of 2017 (amending Ark. Const. amend. 98, § 17); Act 740 of 2017 (amending Ark. Const. amend. 98, §§ 4 & 6); Act 948 of 2017 (amending Ark. Const. amend. 98, §§ 5 & 8); Act 1022 of 2017 (amending Ark. Const. amend. 98, § 11); Act 1023 of 2017 (amending Ark. Const. amend. 98, §§ 4 & 8); Act 1024 of 2017 (amending Ark. Const. amend. 98, §§ 3 & 8); Act 1098 of 2017 (amending Ark. Const. amend. 98, § 17); Act 1099 of 2017 (amending Ark. Const. amend. 98, § 6); Act 1100 of 2017 (amending Ark. Const. amend. 98, § 8); Act 1 of 2017 (1st Extraordinary Sess.) (amending Ark. Const. amend. 98, §§ 2, 4, 6, 8 & 17); Act 8 of 2017 (1st Extraordinary Sess.) (amending Ark. Const. amend. 98, §§ 2, 4, 6, 8 & 17); Act 694 of 2019 (amending Ark. Const. amend. 98 by adding § 26); Act 1004 of 2019 (amending Ark. Const. amend. 98, § 8); Act 666 of 2021 (amending Ark. Const. amend. 98, §§ 4 & 8).

challenged Medical Marijuana Commission rules restricting advertising by cultivators and dispensaries, arguing those rules violated the First Amendment. According to GDFA and CCM, declaratory judgment was necessary to render the legislative amendments unconstitutional, null, and void, which in turn would allow the original text of amendment 98, as initially adopted by the people of Arkansas in 2016, to remain in full effect without the twenty-eight subsequent legislative amendments.

The State opposed the complaint, and the parties filed competing motions for summary judgment. In the State's cross-motion for summary judgment, it asserted that the General Assembly acted within its constitutional authority under article 5, section 1, and that it was entitled to dismissal of the complaint under sovereign immunity.[2] GDFA and CCM subsequently amended their complaint and incorporated into their motion for summary judgment an additional claim: that the legislative amendments were

---

[2]Below, the State asserted the defense of sovereign immunity to GDFA and CCM's claims. Arkansas's sovereign immunity originates in article 5, section 20 of the Arkansas Constitution, which provides that "[t]he State of Arkansas shall never be made defendant in any of her courts." Ark. Const. art. 5, § 20. This doctrine bars a suit if a judgment for the plaintiff "will operate to control the action of the State or subject [the State] to liability." *Ark. Dep't of Fin. & Admin. v. Carpenter Farms Med. Grp., LLC*, 2020 Ark. 213, at 7, 601 S.W.3d 111, 117 (quoting *Bd. of Trs. of Univ. of Ark. v. Andrews*, 2018 Ark. 12, at 5, 535 S.W.3d 616, 619). But in *Martin v. Haas*, we reiterated that "our sovereign immunity [jurisprudence] allow[s state] actions that are illegal, unconstitutional, or ultra vires to be enjoined." 2018 Ark. 283, at 7, 556 S.W.3d 509, 514 (cleaned up). Thus, allegations of illegal state action remain an exception to sovereign immunity. *Carpenter Farms Med. Grp., LLC*, 2020 Ark. 213, at 7–8, 601 S.W.3d at 117 (citing *Monsanto Co. v. Ark. State Plant Bd.*, 2019 Ark. 194, at 9, 576 S.W.3d 8, 13; *Ark. Game & Fish Comm'n v. Heslep*, 2019 Ark. 226, at 6, 577 S.W.3d 1, 5; *Ark. State Plant Bd. v. McCarty*, 2019 Ark. 214, at 7, 576 S.W.3d 473, 477). Here, GDFA and CCM allege that the General Assembly acted illegally by amending amendment 98 twenty-eight times since its adoption. Because they claim constitutional violations and seek declaratory and injunctive relief, not monetary damages, this action falls within the exception and is not barred by sovereign immunity. Thus, we are not barred from reaching the merits of this case.

4

unconstitutional because they were not "germane to this section" as required by section 23(a) of amendment 98.

After a hearing on the matter, the circuit court granted partial summary judgment for GDFA and CCM on Count I. The circuit court held that *Edgmon* controlled under the principle of stare decisis and required that any amendment to amendment 98 be submitted to the people of Arkansas for approval under article 19, section 22. It further concluded that the twenty-eight subsequent amendments were not germane to section 23 of amendment 98 and were therefore unconstitutional and void. The circuit court denied the State's later motion to vacate or modify that order. Following this ruling, GDFA and CCM voluntarily dismissed Count II of their complaint, thereby rendering the circuit court's earlier orders appealable. A final order incorporating those rulings was entered, and the State now appeals.[3] The State seeks reversal of the circuit court's order granting summary judgment in favor of GDFA and CCM.

## II. *Law & Analysis*

This appeal presents two questions on constitutional interpretation: (1) whether the General Assembly has the authority under article 5, section 1 to amend amendment 98; and (2) whether the word "section" in section 23(a) of amendment 98 should be read as "amendment" for purposes of applying amendment 98's germaneness requirement.

---

[3]The State appeals from the circuit court's order that granted GDFA and CCM's motion for summary judgment on Count I and motion for voluntary dismissal on Count II of their complaint. That order was final. *Cherokee Nation Bus., LLC v. Gulfside Casino P'ship*, 2023 Ark. 153, at 4, 676 S.W.3d 368, 371; *see also* Ark. R. App. P.–Civ. 2(a)(1). As this is an appeal from a final order on both Counts I and II, and involves the interpretation of the Arkansas Constitution, we have jurisdiction. Ark. Sup. Ct. R. 1-2(a)(1).

5

## A. Standard of Review

Our law is clear that summary judgment is to be granted only when there are no genuine issues of material fact to be litigated, and the movant is entitled to judgment as a matter of law. *See* Ark. R. Civ. P. 56(c)(2); *see also Boyle Ventures, LLC v. City of Fayetteville*, 2025 Ark. 71, at 4, 711 S.W.3d 280, 283; *Cherokee Nation Bus., LLC v. Gulfside Casino P'ship*, 2023 Ark. 153, at 4, 676 S.W.3d 368, 371. When parties file cross-motions for summary judgment, which is what happened here, they agree that there are no disputes as to the facts of the case and that summary judgment is an appropriate means of resolving the dispute. *Cherokee Nation Bus., LLC*, 2023 Ark. 153, at 5, 676 S.W.3d at 371–72. Thus, we simply determine whether GDFA and CCM were entitled to judgment as a matter of law. *Id.* at 5, 676 S.W.3d at 371. When issues of law are presented on appeal, including the interpretation of constitutional provisions, our review is de novo. *Corbitt v. Ark. State Univ.*, 2024 Ark. 44, at 3, 685 S.W.3d 901, 903; *Cherokee Nation Bus., LLC*, 2023 Ark. 153, at 5, 676 S.W.3d at 372.

## B. The Historical Backdrop of *Arkansas Game & Fish Commission v. Edgmon*

In *Arkansas Game & Fish Commission v. Edgmon*, the court considered whether the General Assembly could enact Act 183 of 1949, which appropriated Commission funds for wolf-bounty payments. *See generally Edgmon*, 218 Ark. 207, 235 S.W.2d 554 (1951). The Commission refused to disburse the funds, arguing in part that Act 183 was constitutionally invalid as it conflicted with amendment 35 and because the General Assembly lacked authority to amend or alter an initiated constitutional amendment. *Id.*, 235 S.W.2d 554. The challengers relied on the fact that Act 183 had received the two-thirds vote of the

6

General Assembly contemplated by article 5, section 1, which provides that "no measure approved by a vote of the people shall be amended or repealed" except by a two-thirds vote of both houses. *Id.* at 210, 235 S.W.2d at 556. Thus, the central question in *Edgmon* was whether this provision allowed the General Assembly to amend a citizen-initiated constitutional amendment. *Id.* at 209, 235 S.W.2d at 556.

The *Edgmon* court answered "no." *Id.* at 211, 235 S.W.2d at 556–57. Despite article 5, section 1's plain language—including its definition of "measure" as including a "constitutional amendment"—the court rejected the possibility that the General Assembly could amend or repeal a constitutional amendment initiated by the people. *Id.*, 235 S.W.2d at 556–57. It reasoned that such a conclusion was "inconceivable," declaring: "It is inconceivable that in defining constitutional amendment as a measure the purpose was to invest the General Assembly with the power (a) to repeal a constitutional amendment, or (b) with authority to amend an amendment." *Id.*, 235 S.W.2d at 556. The court concluded that article 5, section 1's definition of "measure" could not be applied to constitutional amendments in this context, holding that the General Assembly had *no* authority to amend or alter an initiated constitutional amendment, despite article 5, section 1's express text to the contrary. *Id.*, 235 S.W.2d at 557. As a result, Act 183 was held void.[4]

C. Article 5, Section 1 and Its Grant of Power to the General Assembly

We first turn to the scope of the General Assembly's authority to amend or repeal laws initiated and approved by the people. Section 23(a) of amendment 98, entitled

---

[4]*Edgmon* was decided 74 years ago, long before this court's modern line of cases interpreting article 5, section 1, and reflects the era's limited engagement with the initiative-and-referendum process.

"Amendment by General Assembly," authorizes the General Assembly to amend the

Arkansas Medical Marijuana Amendment of 2016. It provides, in pertinent part, that

> the General Assembly, *in the same manner as required for amendment of laws initiated by the people*, may amend the sections of this amendment . . . .

Ark. Const. amend. 98, § 23(a) (emphasis added). Amendment 7 amended article 5, section

1's amendment-and-repeal provision to state

> [n]o measure approved by a vote of the people shall be amended or repealed by the General Assembly or by any city council, except upon a yea and nay *vote on roll call of two-thirds of all the members elected to each house of the General Assembly*, or of the city council, as the case may be.

Ark. Const. art. 5, § 1 (emphasis added). The term "measure," as used above, includes any

"bill, law, resolution, ordinance, charter, constitutional amendment or legislative proposal

or enactment of any character." Ark. Const. art. 5, § 1. This court previously interpreted

this language to mean that "laws initiated by the people may be amended through a two-

thirds vote of both houses of the General Assembly." *See Martin*, 2018 Ark. 283, at 10, 556

S.W.3d at 516.

In *Martin v. Haas*, we reviewed a challenge to Act 633 of 2017, a legislative

amendment to amendment 51, the Voter Registration Amendment. *Id.* at 1, 10, 556

S.W.3d at 511, 516. Like amendment 98, the Voter Registration Amendment was proposed

by initiative petition and approved by the voters. And like amendment 98, the Voter

Registration Amendment contains a provision setting forth the rules for future amendments.

That provision reads,

> [t]he General Assembly may, *in the same manner as required for amendment of laws initiated by the people*, amend Sections 5

8

through 15 of this amendment, so long as such amendments are germane to this amendment, and consistent with its policy and purposes.

Ark. Const. amend. 51, § 19 (emphasis added). As noted above, we interpreted this language—"*in the same manner as required for amendment of the laws initiated by the people*"—to invoke article 5, section 1's two-thirds legislative amendment procedure. The operative language in amendment 98 is not only materially identical, but the context and purpose of amendment 98 appear to be consistent with that of amendment 51.

We generally interpret identical language consistently, even across different provisions and especially where the context and purpose are consistent, so as to not give one provision a meaning at one point in time only to interpret it differently later. *See Kelley v. USAA Cas. Ins. Co.*, 371 Ark. 344, 348, 266 S.W.3d 734, 738 (2007); *State Farm Mut. Auto. Ins. Co. v. Henderson*, 356 Ark. 335, 342, 150 S.W.3d 276, 280 (2004); *Foster v. Jefferson Cnty. Quorum Ct.*, 321 Ark. 116-A, 116-G, 901 S.W.2d 809, 817 (1995) (where "[t]his court has made it clear that constitutional provisions should receive a consistent and uniform interpretation and when one interpretation has been followed for a number of years, it should not be changed."); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts: Presumption of Consistent Usage Canon*, 170 (2012) (whereas a word or phrase is presumed to bear the same meaning throughout a text, such as our state constitution).

Accordingly, the analysis in *Martin v. Haas* controls here. To hold otherwise would interpret the same constitutional phrasing differently in two substantially identical contexts.

9

In sum, this court effectively set *Edgmon* aside seven years ago, and nothing persuades us to chart a different course now.

Against this backdrop, the parties offer sharply divergent views of the General Assembly's authority. The State urges us to overrule *Edgmon* and hold that the plain text of article 5, section 1 confers upon the General Assembly the authority to amend or repeal laws initiated and approved by the people with a two-thirds vote of both houses. GDFA and CCM counter that overruling *Edgmon* would give the General Assembly broad, unchecked authority to amend or repeal *any* of the constitution's amendments—whether initiated by the people or by the General Assembly—thus upsetting the equilibrium among Arkansas's coordinate branches of government and the people of Arkansas. Thus, GDFA and CCM would have us preserve *Edgmon*, thereby reaffirming its posture that article 19, section 22 imposes a constitutional limitation, as was done below in this case, on legislative power when amending citizen-initiated acts, thereby protecting the balance between the General Assembly and the people's reserved lawmaking authority.

Article 19, section 22 provides, in pertinent part, that

> [e]ither branch of the General Assembly, at a regular session thereof, may propose amendments to this Constitution; and if the same be agreed to by a majority of all members elected to each house, such proposed amendments shall be . . . submitted to the electors of the State, for approval or rejection; and if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution. But no more than three amendments shall be proposed or submitted at the same time.

Ark. Const. art. 19, § 22. However, this provision governs the General Assembly's authority to propose *its own* constitutional amendments to the constitution, three per regular session,

10

and submit them to the people for ratification; it does not govern the more specific process of legislatively amending the laws initiated by the people pursuant to article 5, section 1. *See Kimbrell v. Thurston*, 2020 Ark. 392, at 3–4, 611 S.W.3d 186, 189; *see also Steele v. Thurston*, 2020 Ark. 320, at 8, 609 S.W.3d 357, 362; *Martin v. Humphrey*, 2019 Ark. 295, at 1–2, 7, 8, 558 S.W.3d 370, 372, 375, 376; *Forrester v. Martin*, 2011 Ark. 277, at 7, 383 S.W.3d 375, 380; *cf. Martin*, 2018 Ark. 283, at 10, 556 S.W.3d at 516. GDFA and CCM overreach in claiming that overruling *Edgmon* would grant the General Assembly the broad and unchecked power to amend *any* constitutional provision by a two-thirds vote of both houses. This is not the case. Overruling *Edgmon would* allow the General Assembly to exercise its constitutional authority to amend the laws initiated by the people according to the plain text of article 5, section 1. Overruling *Edgmon would not* allow the General Assembly to circumvent the constitutional process for amending *all other* constitutional provisions governed by article 19, section 22.

Additionally, any perceived tension due to the coexistence of article 5, section 1 and article 19, section 22, is resolved comfortably by our standard principles of constitutional construction. When construing constitutional language, we must consider the entire text of the constitution, including the structure and placement of its clauses. *Scalia & Garner*, *supra* at 167 (the "Whole-Text Canon"). And where two provisions conflict, the more specific controls. *Id.* at 183. Article 19, section 22 governs legislatively initiated amendments to the constitution as a whole; article 5, section 1 governs legislative amendments to citizen-initiated measures, including citizen-initiated amendments, solely.

11

The latter is the more specific provision here and therefore governs to the exclusion of article 19, section 22.

As to *Edgmon*, we agree that it must be overruled. The *Edgmon* court refused to follow the plain text of article 5, section 1. At its most in-depth analysis of the conflict between article 5, section 1 and article 19, section 22, the *Edgmon* court acknowledged that article 5, section 1 authorizes legislative amendment of citizen-initiated constitutional amendments by two-thirds vote, but rejected that interpretation as purely "inconceivable." *Edgmon*, 218 Ark. at 210–11, 235 S.W.2d at 556–57 ("It is *inconceivable* that in defining constitutional amendment as a *measure* the purpose was to invest the General Assembly with the power (a) to repeal a constitutional amendment, or (b) with authority to amend an amendment . . . .") (emphasis added). Far from "inconceivable," the General Assembly's authority on this question plainly and unambiguously resides in article 5, section 1. It is perfectly conceivable that the authors of said provision provided yet another opportunity for further diffusion of power that is emblematic of our system of checks and balances. While the wisdom of this particular grant might be questioned and while such authority may be perceived as inconvenient given one's perspective on the role and power of the legislative branch, such public policy arguments underlying these criticisms appropriately lie outside the scope of this court's prerogative. We remain steadfast in rejecting any effort to substitute our own judgment for that of the plain, unambiguous constitutional language, especially when that judgment has the effect of achieving a preferred public policy outcome reserved to the people and their elected representatives.

The *Edgmon* court's reasoning substituted judicial preference for plain constitutional text, and thus contravened the interpretive obligation imposed upon the *Edgmon* court at the time, just as it would on this court now. *See Ellison v. Oliver*, 147 Ark. 252, 264, 227 S.W. 586, 589 (1921) ("The first rule of construction is that, where the language used in a Constitution is plain and unambiguous, the court cannot seek other aids of interpretation."); *State ex rel. Att'y Gen. v. Irby*, 190 Ark. 786, 789, 81 S.W.2d 419, 420 (1935); *see also Cherokee Nation Bus.*, 2023 Ark. 153, at 5, 676 S.W.3d at 372 (where we give plain and unambiguous language in a constitutional provision its obvious and common meaning and do not apply the rules of construction or the rules of interpretation to defeat the clear and certain meaning of a constitutional provision).

Substituting the plain and unambiguous language of a constitutional provision to achieve a preferred judicial outcome is not within the province of an appellate court. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 984 (1992) (Scalia, J., concurring in part and dissenting in part) (criticizing the Court for abandoning its role of interpreting law and exercising raw political power and invoking Justice Curtis's "warning" from the *Dred Scott* decision)[5]; *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 271, 279 (2022) (highlighting the importance of basing constitutional interpretation on established sources

---

[5]"[W]hen a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, *according to their own views of what it ought to mean*." *See Dred Scott v. Sandford*, 60 U.S. 393, 621 (1857) (Curtis, J., dissenting) (emphasis added).

13

and principles rather than judicial preference). Such an approach is incompatible with our basic constitutional-interpretation principles as stated earlier. *See Cherokee Nation Bus.*, *supra*.

Therefore, contrary to GDFA and CCM's argument that stare decisis controls and *Edgmon* should be upheld, we find that decision subordinate to legal reason and justice. As Justice Thomas observed, "The true irony of our modern stare decisis doctrine lies in the fact that proponents of stare decisis tend to invoke it most fervently when the precedent at issue is least defensible." *Gamble v. United States*, 587 U.S. 678, 724–25 (2019) (Thomas, J., concurring). And we "should not invoke stare decisis to uphold precedents that are demonstrably erroneous[,]" as we have explained above. *Id*. at 726. To do so would be to depart from "our judicial duty . . . because it elevates demonstrably erroneous decisions— meaning decisions outside the realm of permissible interpretation—over the text of the Constitution[.]" *Id*. at 711.

There is no cognizable reason to keep *Edgmon* on the shelves of Arkansas case law. It is singularly relied upon for the very reasons asserted by GDFA and CCM as its posture rests on a demonstrably erroneous premise.[6] Departing from *Edgmon*'s precedent is therefore

---

[6]The following six cases cite *Edgmon* for purposes that do not support GDFA and CCM's position on appeal: *Pritchett v. Spicer*, 2017 Ark. 72, at 8–9, 513 S.W.3d 252, 257; *Dockery v. Morgan*, 2011 Ark. 94, at 11–12, 380 S.W.3d 377, 385; *Chaffin v. Ark. Game & Fish Comm'n*, 296 Ark. 431, 437, 757 S.W.2d 950, 953 (1988); *Ark. State Game & Fish Comm'n v. Stanley*, 260 Ark. 176, 180, 538 S.W.2d 533, 535 (1976); *Farris v. Ark. State Game & Fish Comm'n*, 228 Ark. 776, 781, 310 S.W.2d 231, 234–35 (1958); *State Game & Fish Comm'n v. Hornaday*, 219 Ark. 184, 187, 242 S.W.2d 342, 344 (1951). *Hampton v. Ark. State Game & Fish Comm'n*, 218 Ark. 757, 764 n.3, 238 S.W.2d 950, 954 n.3 (1951), is the only decision that cites *Edgmon* for the proposition that the General Assembly lacks authority to "amend or repeal" constitutional amendments initiated by the people.

justified to "avoid the perpetuation of pernicious error." *See Brickhouse v. Hill*, 167 Ark. 513, 522, 268 S.W. 865, 868 (1925) (quoting 7 R.C.L. 1008 (1915)).

Accordingly, we now make explicit what *Martin v. Haas* made implicit and overrule *Arkansas Game & Fish Commission v. Edgmon*, 218 Ark. 207, 235 S.W.2d 554 (1951), in its entirety as "more good than harm would result from changing it at this time[.]" *Nooner v. State*, 2014 Ark. 296, at 12, 438 S.W.3d 233, 241 (quoting *Brickhouse v. Hill*, 167 Ark. 513, 519, 268 S.W. 865, 867 (1925)). We therefore reverse the circuit court's ruling declaring the twenty-eight legislative amendments to amendment 98 null and void, as that conclusion rested on a clearly erroneous interpretation of article 5, section 1 and section 23(a) of amendment 98.

D. Amendment 98, Section 23(a) and its Germaneness Requirement for Amendments

For its second point on appeal, the State contends that the word "section" in section 23(a) of amendment 98 should be construed to mean "amendment," asserting that the use of "section" was merely a drafting error. GDFA and CCM argue that "section" means what it says. While we agree with the State that the use of "section" was likely a scrivener's error as the provision functions sensibly only when "section" is read as "amendment," we reach that conclusion by looking at the public's understanding of amendment 98 at the time of adoption, interpreting the text in harmony with similar constitutional provisions, and by applying established canons of construction. We acknowledge the tension between our adherence to the constitution's plain text in holding—when explicitly overruling *Edgmon*—that article 5, section 1 authorizes the General Assembly to amend laws initiated by the people, and our use of interpretive principles here. But the inoperability of section 23(a) of

15

amendment 98 leaves us no choice to avoid running headlong into an inoperable and absurd result. *Curry v. Pope Cnty. Equalization Bd.*, 2011 Ark. 408, at 10, 385 S.W.3d 130, 136; *Buonauito v. Gibson*, 2020 Ark. 352, at 7 n.1, 609 S.W.3d 381, 386 n.1. There is no such obstacle in article 5 section 1, whose plain meaning is clear and unambiguous, and operates harmoniously with other provisions of the Arkansas Constitution. Therefore, to give section 23(a) coherence and effect, we *are compelled to* employ established canons of constitutional construction.

Section 23 of amendment 98 of the Arkansas Constitution provides

> (a) Except as provided in subsection (b) of this section, the General Assembly, in the same manner as required for amendment of laws initiated by the people, may amend the sections of this amendment so long as the amendments are germane to this section and consistent with its policy and procedures.
>
> (b) The General Assembly shall not amend the following provisions of this amendment:
>
> (1) Subsections (a), (b), and (c) of § 3;
>
> (2) Subsection (h), (i), and (j) of § 8; and
>
> (3) Section 23.

Ark. Const. amend. 98, § 23. At the outset, we agree with the circuit court and the parties that the General Assembly is barred from amending certain portions of amendment 98, including section 23 itself, as expressly stated in section 23(b). *See* Ark. Const. amend. 98, § 23(b).

The dispute lies in section 23(a), which provides that "so long as the [General Assembly's] amendments are *germane to this section* and consistent with its policy and

purposes." *See* Ark. Const. amend. 98, § 23(a) (emphasis added). GDFA and CCM interpret this provision to mean that any legislative amendment must be germane *specifically* to section 23, rather than to amendment 98 *as a whole*. The State, however, contends that such a reading renders the provision superfluous, meaningless, and inoperative because section 23—entitled "Amendment by General Assembly"—cannot *itself* be amended. The State further argues that this interpretation would absurdly require the General Assembly to make any and all amendments "germane to [the] Amendment by General Assembly" provision but would then codify them elsewhere within amendment 98. We agree that such a result would render the provision superfluous, meaningless, and inoperative.

1. *The voters' understanding at adoption*

We find it prudent to start by looking at the public's understanding of amendment 98 at the time that it was adopted in 2016. This has been a cornerstone of this court's constitutional interpretation since 1925. *See generally Brickhouse*, 167 Ark. 513, 268 S.W. 865. In *Rose v. Martin*, we quoted the original ballot title of the Arkansas Medical Marijuana Amendment of 2016. 2016 Ark. 339, at 3, 500 S.W.3d 148, 151. In pertinent part, the ballot title stated

> An amendment to the Arkansas Constitution . . . *permitting the General Assembly by two-thirds vote to amend the sections of the amendment*, except that the General Assembly may not amend the sections legalizing the medical use of marijuana and setting the number of dispensaries or cultivation facilities allowed.

*Id.*, 500 S.W.3d at 151 (emphasis added). The plain language of the ballot title underscored the General Assembly's power to amend nearly all sections of amendment 98. Contemporaneous reporting at the time of adoption further supports this understanding.

The *Arkansas Democrat-Gazette* noted that "[w]ith two exceptions, the amendment would give the [General Assembly] broad authority to change any aspect of the law by a two-thirds vote."[7]  KARK likewise reported that "[t]he measure lays out procedure for allowing lawmakers to change the amendment with a two-thirds vote."[8]

Section 23 solely concerns the process of amending amendment 98.  Under GDFA and CCM's interpretation, an amendment would be "germane" to section 23 *only if* it addressed the process of amending amendment 98.  That reading would render the General Assembly unable to do what the ballot title expressly stated it could do, and what the public understood at the time of adoption that it could do, which is amend any portion of amendment 98 not protected by section 23(b).  GDFA and CCM argue, essentially, that the General Assembly can only amend section 23 because it says, "germane *to this section*" instead of "germane *to this amendment*."  We believe that when Arkansans stepped into the voting booth to cast their votes on adopting or rejecting amendment 98, they would likely understand from the ballot title that the General Assembly could amend *any portion* of amendment 98 except for the provisions relating to the legalization of marijuana for medical purposes[9] and the number of dispensaries or cultivation facilities that could exist.[10]  This understanding directly contradicts GDFA and CCM's argument that section 23 says that the

---

[7]Brian Fanney & John Moritz, "Issue 6 legalizes, sets rules on medical 'pot'," *Ark. Democrat-Gazette*, Nov. 6, 2016.

[8]KARK, *Issue 6 Paves Path for Medical Marijuana in Arkansas* (Nov. 6, 2016), available at https://www.kark.com/news/issue-6-paves-path-for-medical-marijuana-in-arkansas/.

[9]Ark. Const. amend. 98, § 23(b)(1).

[10]Ark. Const. amend. 98, § 23(b)(2).

General Assembly can only functionally amend section 23. Therefore, we have no choice but to construe "section" to function as "amendment," otherwise, the people's understanding of amendment 98 at the time of adoption would be undermined.

## 2. *Parallel constitutional provisions*

Second, the Arkansas Constitution must be considered as a unified document, and each provision must be interpreted in harmony with other provisions relating to the same subject matter. *See Cherokee Nation Bus., LLC*, 2023 Ark. 153, at 5, 676 S.W.3d at 372; *Pritchett v. Spicer*, 2017 Ark. 82, at 3, 513 S.W.3d 252, 254; *Kelly v. Martin ex rel. State*, 2014 Ark. 217, at 4, 433 S.W.3d 896, 899; *see also Scalia*, *supra* at 167 (where the whole-text canon requires that the text of a document must be construed as a whole), 180 (where the harmonious–reading canon requires that the provisions of a text should be interpreted in a way that renders them compatible, not contradictory). Accordingly, to understand the operation and scope of section 23(a)'s germaneness requirement, we look to constitutional provisions employing similar language.

As discussed in our analysis of the first issue on appeal, amendment 51, which concerns voter registration in Arkansas, provides

> The General Assembly may, in the same manner as required for amendment of laws initiated by the people, amend Sections 5 through 15 of this amendment, so long as such amendments are *germane to this amendment*, and consistent with its policy and purposes.

Ark. Const. amend. 51, § 19 (emphasis added). Likewise, amendment 89, which relates to interest rates on governmental bonds, states

> The General Assembly may by a three-fourths vote of each house of the General Assembly amend the provisions of this

19

> amendment so long as the amendments are *germane to this amendment* and consistent with its policy and purposes.

Ark. Const. amend. 89, § 11(a) (emphasis added). Among the more than one hundred constitutional amendments, only amendments 51, 89, and 98 contain this distinctive germaneness framework, and all three were proposed and adopted by the people of Arkansas. Yet amendments 51 and 89 use the phrase "germane *to this amendment*," while amendment 98 uniquely employs "germane *to this section*." Given the striking similarity of structure, purpose, and context, we are unable to identify any persuasive textual, structural, or historical basis for construing section 23(a) differently from its constitutional counterparts. Reading "section" as "amendment" is therefore necessary for section 23(a) to function coherently within the scheme of amendment 98, and the constitution as a whole.

### 3. *Syntactic and structural inoperability*

Lastly, there is a syntactic argument that the text of the provision reveals an internal inconsistency and functional impossibility that leads to an absurd result. This court will not engage in interpreting provisions such as to defy common sense and produce absurd results. *See Walther v. FLIS Enters., Inc.*, 2018 Ark. 64, at 9–10, 540 S.W.3d 264, 270 (quoting *Clark v. Johnson Reg'l Med. Ctr.*, 2010 Ark. 115, at 8, 362 S.W.3d 311, 316); *see also Scalia*, *supra* at 234 (where the absurdity doctrine requires us to disregard, or judicially correct, an error in a provision, when such correction is textually simple, if failing to do so would result in a disposition that no reasonable person could approve). The pronoun "its" must refer back to something, and here "its" refers back to "section." Ark. Const. amend. 98, § 23(a). But "section" cannot be the correct antecedent, because section 23 itself contains no "policy and purposes." *See generally* Ark. Const. amend. 98, § 23. However, amendment 98, as a

20

whole, does. *Compare* Ark. Const. amend. 98, §§ 2–19, 21 & 24–25, *with* Ark. Const. amend. 98, § 23. Reading "section" as "amendment" therefore allows the provision to function grammatically, coherently, and according to its intended design while avoiding the absurd result that GDFA and CCM would have us reach.

All three strands of analysis lead us to conclude that the word "section" in section 23(a) is a drafting error. Reading "section" as written cannot be reconciled with the people's understanding that the General Assembly may amend all permissible sections of amendment 98. That understanding would be thwarted if section 23(a) were interpreted to limit amendment authority to a single section. Moreover, section 23(a)'s companion provisions elsewhere in the constitution use "amendment," not "section," in nearly identical contexts. Finally, the phrase as written is syntactically inoperable, confirming that "section" cannot be given its plain and unambiguous meaning without rendering the provision unworkable. And though we have cautioned that we are hesitant to construe constitutional text in a manner that departs from its express language, evidence of a clear drafting error that frustrates the provision's intended operation permits and, in fact, necessitates such departure. *See Simpson v. Cavalry SPV I, LLC*, 2014 Ark. 363, at 3–4, 6–7, 440 S.W.3d 335, 338, 339 (recognizing that where a drafting error or omission in a legislative act circumvents the legislature's intent, this court may correct the error). While *Simpson* involved a statute, the principles applied there provide a sufficiently close analogue here: the intent of the people, the parallel constitutional provisions, and the syntactic inoperability of section 23(a) collectively demonstrate sufficient evidence that the use of "section" was an evident drafting mistake—and one that must be corrected.

21

Therefore, upon reviewing amendment 98 in its entirety, it is clear that the intent of section 23 was to permit the General Assembly to amend the sections of amendment 98 that are unrestricted so long as any such amendment is germane to amendment 98 as a whole; not merely to section 23 itself. Such reading respects the understanding of the people of Arkansas when they voted for or against amendment 98, aligns amendment 98 with parallel constitutional provisions of the same subject matter, and brings harmony within the constitutional framework of amendment 98 itself. Accordingly, we construe section 23(a) of amendment 98 to read as follows

> Except as provided in subsection (b) of this section, the General Assembly, in the same manner as required for amendment of laws initiated by the people, may amend the sections of this amendment so long as the amendments are germane to this [*amendment*] and consistent with its policy and purposes.

Ark. Const. amend. 98, § 23(a) (emphasis added). Therefore, we reverse the circuit court's ruling that the twenty-eight legislative amendments to amendment 98 are null and void, as that conclusion rested on a clearly erroneous interpretation of section 23(a)'s germaneness requirement for amendments to amendment 98.

## IV. *Conclusion*

In accordance with this court's precedent in *Martin v. Haas*, the plain text of article 5, section 1 grants the General Assembly the authority to amend the laws initiated by the people of this state by a two-thirds vote of both houses of the General Assembly, which is what section 23(a) of amendment 98 expressly allows. Additionally, *Arkansas Game & Fish Commission v. Edgmon*, 218 Ark. 207, 235 S.W.2d 554 (1951), is hereby overruled in its entirety. Further, we construe the word "section" to function as "amendment" for the

22

purposes of applying the germaneness requirement of section 23(a) of amendment 98. Therefore, we reverse and dismiss.

Reversed and dismissed.

Special Justices BARBARA HALSEY and DON CURDIE join.

BAKER, C.J., and WOOD and WOMACK, JJ., concur.

HUDSON and BRONNI, JJ., not participating.

**RHONDA K. WOOD, Justice, concurring.** I agree that the General Assembly has the power under section 23 of amendment 98 to make legislative amendments to amendment 98. Because I believe that overruling *Arkansas Game & Fish Commission v. Edgmon*[1] is an unnecessary and advisory resolution of this case, I respectfully concur.

The question before us is whether the General Assembly has the authority to modify amendment 98. The answer is yes. The text of amendment 98 tells us how the amendment may be changed. Section 23 of amendment 98 specifies the proper procedure for, and the limits on, the General Assembly's power to modify amendment 98. It says the General Assembly may make amendments to amendment 98 in "the same manner as required for amendment of laws initiated by the people[.]"[2] We have decided how this process works. In *Martin v. Haas*, we held that the language "manner as required for amendment of laws

---

[1] 218 Ark. 207, 235 S.W.2d 554 (1951).

[2] Ark. Const. amend. 98, § 23(a).

initiated by the people" is the process set out in article 5, section 1.[3] It resolves our question, and that is where I would end the inquiry.

Overruling *Edgmon* goes a step too far. We need not decide and, per the doctrine of constitutional avoidance, should not decide[4] whether other constitutional amendments initiated by the people may be amended by the General Assembly. In *Martin v. Haas*, we were interpreting amendment 51 which, like amendment 98, specifies in its own text the process for legislative amendment. The majority's suggestion that we implicitly overruled *Edgmon* in *Haas* is misplaced. *Edgmon* was not on point in *Haas* because the issues were different. *Edgmon* dealt with whether the General Assembly could amend a constitutional amendment—amendment 35—that *did not* contain a provision for such amendment. Amendment 98, like amendment 51 in *Haas*, does have that provision.

The prudent course is to refrain from overruling precedent when resolution of the inquiry before us does not require it. While I suggest no opinion as to whether *Edgmon* was decided correctly, we did not reach *Edgmon* in *Haas*, and we should not reach it here.[5]

I respectfully concur.

---

[3]*Martin v. Haas*, 2018 Ark. 283, at 9-10, 556 S.W.3d 509, 515–16; *see also* Ark. Const. article 5, § 1.

[4]*See, e.g., Prock v. Bull Shoals Boat Landing*, 2014 Ark. 93, at 17, 431 S.W.3d 858, 869 ("It is our duty to refrain from addressing constitutional issues if or when the case can be disposed of without determining constitutional questions.").

[5]The appropriate time to revisit *Edgmon* is when we have a challenge to the General Assembly's amendment that does not contain a provision allowing it.

**SHAWN A. WOMACK, Justice, concurring.**   I agree with the majority that legislative amendments to measures approved by a vote of the people are authorized under the plain text of article 5, section 1 and that the language therein requires this court to overturn our atextual decision in *Arkansas Game & Fish Commission v. Edgmon*, 218 Ark. 207, 235 S.W.2d 554 (1951).  Likewise, I agree that section 23 of amendment 98 contains an obvious scrivener's error and that to avoid an absurd result, the phrase "germane to this section" must be read as "germane to this amendment."  The majority therefore reaches the correct disposition: reversing and dismissing the circuit court's order granting summary judgment to the Appellees.  However, I write separately because the constitution requires that we reverse and dismiss on the basis of sovereign immunity alone.

Article 5, section 20 of the Arkansas Constitution provides that "[t]he State of Arkansas shall never be made defendant in any of her courts."[1]  This prohibition is jurisdictional and absolute unless a specific constitutional provision waives it.[2]  Suits seeking declaratory or injunctive relief against the State or its agencies are generally barred.[3]  Although article 5, section 1 carves out a narrow exception to sovereign immunity, that exception is limited: it grants this court exclusive jurisdiction to review the sufficiency of

---

[1]Ark. Const. art. 5, § 20.

[2]*Bd. of Trs. of the Univ. of Ark. v. Andrews*, 2018 Ark. 12, at 6, 535 S.W.3d 616, 620; *Thurston v. League of Women Voters of Ark.*, 2022 Ark. 32, at 17, 639 S.W.3d 319, 327 (Womack, J., dissenting).

[3]*Id.*

statewide and local initiative petitions and nothing more.  It authorizes no broader exercise of judicial power.[4]

Here, the Appellees sued the State, the Department of Finance and Administration, and the Alcoholic Beverage Control Division, seeking a declaration that legislative acts are unconstitutional and asking the court to reinstate prior law.  That relief operates directly against the State and its instrumentalities.  Because this lawsuit concerns the validity of legislative amendments—not the sufficiency of an initiated petition—it falls outside the sole article 5, section 1 exception to sovereign immunity.  Sovereign immunity therefore deprives both the circuit court and this court of jurisdiction, requiring reversal and dismissal.

For these reasons, I respectfully concur.


*Tim Griffin*, Att'y Gen., by: *Jordan Broyles*, Sr. Ass't Att'y Gen., for appellant.

*Wright, Lindsey & Jennings, LLP*, by: *Stephen R. Lancaster, Gary D. Marts, Jr.*, and *Erika Gee*, for appellee.

*Friday, Eldredge & Clark, LLP*, by: *Elizabeth R. Murray, Kevin A. Crass, Martin A. Kasten*, and *Kathy McCarroll*, brief of amicus curiae Arkansas State Chamber of Commerce.

---

[4]*See, e.g., Cowles v. Thurston*, 2024 Ark. 121, at 3, 695 S.W.3d 60, 62; *Stilley v. Thurston*, 2024 Ark. 124, at 3 (per curiam).